*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# OPINION

No. 04-09-00230-CV

**PARADIGM OIL, INC.**, Pacific Operators, Inc., Pacific Operators of Texas, Inc.,
and Finley Oil Well Service, Inc.,
Appellants

v.

**RETAMCO OPERATING, INC.**,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2003-CI-14549
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:      Catherine Stone, Chief Justice
              Sandee Bryan Marion, Justice
              Rebecca Simmons, Justice

Delivered and Filed:  August 31, 2010

REVERSED IN PART AND AFFIRMED IN PART

This case returns to us for the third time on a question of damages. The difficulty in this case arises from the unique nature of the damages hearings. In 2003, the trial court imposed death penalty sanctions and granted a default judgment against Appellants Paradigm Oil, Inc., Pacific Operators, Inc., Pacific Operators of Texas, Inc., and Finley Oil Well Service, Inc. (collectively Paradigm) in favor of appellee Retamco Operating, Inc. based on discovery abuses. We upheld the death penalty sanctions, but reversed the judgment as to the amount of damages

and remanded the case for a new hearing on damages. *Paradigm Oil, Inc. v. Retamco Operating, Inc.* (*Paradigm I*), 161 S.W.3d 531, 538 (Tex. App.—San Antonio 2004, pet. denied). Following an appeal from the second hearing on damages, we concluded that the record contained legally insufficient evidence to support the damage award and remanded the case to the trial court for a new trial on damages in the interest of justice. *Paradigm Oil, Inc. v. Retamco Operating, Inc.* (*Paradigm II*), 242 S.W.3d 67, 75 (Tex. App.—San Antonio 2007, pet. denied). In the latest hearing, in January 2009, the trial court awarded past and future damages in excess of $11 million, attorney's fees, costs, prejudgment interest exceeding $4.5 million, and exemplary damages totaling $20 million.

On appeal, Paradigm challenges: (1) the legal and factual sufficiency of the evidence to support the damages found by the trial court; (2) the award of tort damages because the amount of damages was controlled by contract and barred by the economic loss rule; (3) the finding of a causal connection between the injuries and the events sued upon; (4) the award of attorney's fees under Texas law when the contract is controlled by California law; and (5) the failure to credit Paradigm $2.5 million in settlements Retamco received from other parties for the same lost revenue. We reverse the trial court's judgment for the failure to apply a settlement credit, and affirm the judgment in all other aspects.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The Loan**

To understand the parties' arguments, a detailed discussion of the underlying transaction is necessary. In 1984, Retamco established a $70 million credit line with Security Pacific National Bank (SPNB). Following an economic downturn, Retamco decided to liquidate a number of oil and gas properties to pay off the line of credit. Under the terms of the Purchase

Agreement, Retamco transferred 572 oil and gas leases to PNB Security Company (PNB), a SPNB subsidiary, while retaining certain reversionary interests in the properties. Specifically, Retamco retained the right to receive assignments of overriding royalty interests[1] in certain subsequently drilled producing wells and the right to elect after-payout working interests[2] (also known as "back-in" interests) when the revenue from certain subsequently drilled wells exceeded drilling and operating expenses. These rights only applied to "Purchaser Financed Wells" on Class I or Class II properties specifically defined in the 1984 Agreement.[3]

## B. 1984 Agreement

In addition to the interests reserved by Retamco, the 1984 Agreement allowed Retamco to continue operating certain leases already in production; receive notice of lease terminations, sales, or assignments; and exercise certain options to retain a lease. Important to this case, Retamco had the right to be notified when a well reached payout so that Retamco could exercise its option to take its working interest. Additionally, PNB was required to prepare and record, in all applicable counties, a document identifying and describing the rights and benefits of Retamco under the 1984 Purchase Agreement, and to notify every purchaser or assignor of a lease covered under the 1984 Agreement of Retamco's rights and interests. The Purchase Agreement also provided that the 1984 Agreement was binding on all parties including their respective heirs, legal representatives, successors, and assigns. The Agreement also relieved PNB of its obligations to Retamco only if PNB sold or assigned a property subject to Retamco's rights set forth in Article 6 of the 1984 Agreement.

---

[1] "An overriding royalty is an interest in the oil and gas produced at the surface, free of the expense of production." *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 542 n.1 (Tex. App.—Austin 1999, pet. denied) (citing 8 HOWARD WILLIAMS & CHARLES MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 748 (1998)).

[2] "A working interest is the right to share in well production, subject to the costs of exploration and development. Payout is reached when the costs of drilling and equipping the well are recovered from production." *Stable Energy*, 999 S.W.2d at 543 n.2 (citing WILLIAMS & MEYERS, at 769, 1191).

[3] Retamco retained a 20% back-in interest on Class II properties and a 10% back-in interest on Class I properties.

In 1985, PNB transferred approximately 510 of the original 572 leases held by PNB to Clements Production Company. The remaining sixty-two leases were transferred to Paradigm in 1993. PNB failed to disclose the rights held and to be acquired by Retamco when it transferred the properties to Clements and Paradigm. Two categories of properties are involved in this case: the Briscoe wells covered under the Briscoe Lease, located in Webb County, and the "Giddings Leases", covering wells located in Fayette, Lee, and Burleson Counties. Although Retamco operated the Briscoe Lease from 1988 until 2000, it never operated any of the Giddings wells. As will be described in more detail below, Paradigm subsequently transferred its leases to other entities, and Retamco also divested itself of some of its interests retained under the 1984 Agreement.

### C. Procedural Background

In 1999, Retamco sued PNB and its transferees and assignees, including Paradigm, the operators of the oil and gas properties, and others for breach of contract and fraud. Retamco alleged that Paradigm purchased some of the oil and gas properties from PNB, and that under the terms of the 1984 Agreement and Paradigm's contract with PNB, Paradigm succeeded to and became obligated to perform *all* of PNB's obligations to Retamco under the 1984 Agreement even as to those properties never transferred to Paradigm. Retamco claimed that it: (1) had not received assignments of overriding royalty interests to which it was entitled; (2) had been denied its right to timely elect to convert its overriding royalty interests to working interests; and (3) had not been paid the overriding royalties and working interest revenue it was due under the 1984 Purchase Agreement. After several motions for sanctions for discovery abuse were heard, on July 15, 2003, the trial court imposed death penalty sanctions against Paradigm for what it called "bad faith in the litigation process as a whole." The trial court further struck Paradigm's

pleadings and disallowed evidence and argument opposing Retamco's liability and damages claims, and ordered that Appellants: "may not, and are disallowed to, oppose Plaintiff's claims of breach of contract and fraud, fraudulent concealment, accounting, conspiracy, alter ego, joint enterprise liability, claims to overriding royalty interests, damages, exemplary damages, pre-judgment interest, or attorney's fees, whether by cross examination, objection to evidence offered, or offer of evidence." *Paradigm II*, 242 S.W.3d at 70. Despite the inability of Paradigm to object to the evidence or contest liability, as noted earlier, we have remanded the case twice for a new hearing on damages.

In the prior appeal we focused on the sufficiency of the damage evidence provided by land man John Thomas. The court spent much of its attention on the speculative nature of the calculations of operating and drilling expenses, which would, in turn, impact the amount of revenue attributable to the back-in working interests.[4] In reversing the damages award, the *Paradigm II* Court described in detail the nature of the deficiencies in Thomas's testimony, as well as the evidence and testimony necessary to give a competent, relevant, and reliable opinion, holding that "Thomas's opinion as to damages was wholly speculative and conclusory because he failed to provide factual substantiation for the opinions and failed to sufficiently explain how he reached his conclusions." *Id.* at 75. Once again, the case was remanded to the trial court for a new hearing on damages.

In January 2009, after a lengthy hearing, the trial court held that Retamco was entitled to an award of damages from the defendants, jointly and severally in excess of $11 million in compensatory damages. The court further found that Retamco's compensatory damages were based on $3,782,049.00 in damages proximately caused by the failure of the defendants to comply with the 1984 Purchase Agreement, and $7,312,548.00 was attributable to the

---

[4] The back-in working interest is characterized in appellants' brief as the after-payout working interest or APOWI.

defendants' fraud.  In addition, the Court awarded exemplary damages against both Paradigm Oil and Pacific Operators, Inc. in the amount of $7,500,000.00 each, and exemplary damages against Pacific Operators of Texas and Finley Oil Well Service in the amount of $2,500,000.00 each.  The trial court filed findings of fact and conclusions of law and refused to enter the additional findings requested by Paradigm.

## LEGAL AND FACTUAL SUFFICIENCY

Our attention in this appeal is once again drawn to the evidence supporting the damage award.  Paradigm's first issue focuses on the legal and factual insufficiency of the evidence to support the damage award.  Paradigm does not attack a specific finding of the trial court, rather it argues that the findings are conclusory and unsupported by the evidence.

### A.  Standard of Review

The legal and factual sufficiency of the evidence supporting an award of unliquidated damages after a default judgment may be challenged on appeal.  *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84–86 (Tex. 1992); *Arenivar v. Providian Nat'l Bank*, 23 S.W.3d 496, 498 (Tex. App.—Amarillo 2000, no pet.).  To decide Paradigm's "no-evidence" issue, we review the record of the damages hearing in the light most favorable to the verdict and indulge every reasonable inference to support the judgment.  *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).  In reviewing a factual sufficiency challenge, we must consider all the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.  *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

When a no-answer default judgment is rendered, the defendant's liability for all causes of action pled is conclusively established and all allegations of fact in the petition, except the amount of unliquidated damages, are deemed admitted.  *Morgan v. Compugraphic Corp.*, 675

S.W.2d 729, 731 (Tex. 1984). Thus, Retamco had to prove, by competent evidence, the amount of unliquidated damages and that the injury for which damages are sought was proximately caused by the event for which liability has been established. *Id.* at 731–32 & n.2; *see also Paradigm II*, 242 S.W.3d at 72. "The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied).

> This court previously held that the default judgment
>
> conclusively established, as alleged in the petition, that Paradigm assumed all of PNB's obligations under the 1984 contract; that Paradigm committed breach of contract and fraud; and that Paradigm is jointly and severally liable with the other defendants for the damages caused by all of their breaches of contract and fraud.

*Paradigm II*, 242 S.W.3d 72–73 (citing *ABF Freight*, 798 S.W.2d at 615). Thus, to recover, Retamco was required only to prove "by competent evidence the amount of its damages and that its injuries were caused by the breaches of contract and fraudulent conduct." *Id.* at 73.

## B. Legal Conclusions

Paradigm first argues that the evidence is legally insufficient because Retamco's witnesses offered improper legal conclusions on pure legal questions. More specifically, Paradigm argues that the expert opinions of John Thomas and Charles Graham, with regard to Paradigm's obligations under the 1984 Agreement, lacked evidentiary support. Both experts testified concerning the various assignments and agreements pertinent to this case and specifically that Paradigm was PNB's legal successor and assign and assumed PNB's legal obligations under the 1984 Purchase Agreement.

Paradigm's argument is without merit. First, our court previously confirmed that the default judgment "conclusively established, as alleged in the petition, that Paradigm assumed all

of PNB's obligations under the 1984 contract; . . . ." *Paradigm II*, 242 S.W.3d 72. Thus, the experts' conclusions complained of mirror our prior holding. Second, the experts were entitled to rely upon the underlying assignments and leases in arriving at their opinions on damages. Their resulting opinions, consisting of mixed questions of law and fact, detailed their reasoning and how the damages were derived. *See Colo. Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 10 (Tex. App.—Amarillo 2000, pet. denied) (holding expert testimony based on examinations of various underlying documents of title, including leases and assignments, was sufficient evidence regarding the ownership of the interests in question). Finally, even if the experts' opinions on questions of law were inadmissible, "[t]he law presumes that in a matter not tried before a jury, a court disregards any incompetent evidence and considers only the competent evidence in reaching its decision." *Acker v. Denton Pub. Co.*, 937 S.W.2d 111, 119 (Tex. App.—Fort Worth 1996, no writ); *see State ex rel. Grimes County Taxpayers Ass'n v. Tex. Mun. Power Agency*, 565 S.W.2d 258, 277 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ dism'd). The trial court had before it the assignments, leases, and other conveyances upon which the experts based their opinions. The court likewise had before it the terms of the default judgment and our prior opinions regarding damage calculations. We presume the trial court disregarded any incompetent evidence and followed our prior opinions when assessing the damages in this case. *Acker*, 937 S.W.2d at 119; *Grimes County*, 565 S.W.2d at 277. We overrule this issue on appeal.

## C. Amount and Reliability of Damages

### 1. Lack of Evidence of Reasonable Expenses

Paradigm next complains that the damages relating to lost revenue attributable to the back-in working interest lack evidentiary support. Specifically, Paradigm complains that the

evidence regarding operating expenses on the Briscoe Lease is demonstrably inaccurate; and there is no articulable basis for the operating expenses used to calculate damages on the Giddings wells. Notably, the issue is not framed as a lack of evidence of Paradigm overcharging well expenses, but as a lack of sufficient evidence of the reasonable well expenses to support the damages.

In order to review the working interest damages it is important to understand that under the 1984 Agreement, when a well "broke even" or reached "payout"—when the revenue from the well revenues equaled exploration, drilling, and operating expenses—then Retamco was entitled to receive a 10–20% working interest in revenues from that well, depending on its classification. Consequently, evidence of when a well reached "payout" is critical. Retamco's experts calculated when a well reached payout and the subsequent lost revenue by determining the reasonable drilling and operating expenses for the wells at issue.

In attacking the basis used to calculate operating expenses for the Giddings wells and Briscoe Lease, Paradigm focuses on the testimony of Charles Graham and Stephen Gose, pointing to a few statements from the record. Paradigm's selective recitation, however, neglects substantial evidence found in the record. Gose was president and co-owner of Retamco and had fifty-eight years of experience in the oil and gas industry, and had drilled over 750 wells in Texas. Retamco operated the Briscoe Lease from 1988 to 2000. In his testimony, Stephen Gose analyzed the operating expenses associated with the wells under the Briscoe Lease and arrived at an approximate figure of $500.00 per month in the mid-1980s. Retamco's calculations increased this figure to reflect inflation over subsequent years. Charles Graham is a petroleum engineer with extensive experience, including serving as a petroleum engineer for the Briscoe Ranch.[5] He

---

[5] Graham worked as a petroleum engineer for almost 38 years and had experience as an operator of a well.

testified that he was familiar with the reasonable costs to operate wells on the Briscoe Lease, and confirmed the reasonableness of the operating expenses testified to by Gose. Paradigm's complaint targets a purported inaccuracy in Gose's testimony on operational expenses. However, both Gose and Graham had personal knowledge regarding operations on the Briscoe Lease. It was the prerogative of the fact-finder to accept Gose's and Graham's testimony on the reasonableness of the operating expenses, and "great deference [is] given to the judge's determination of witnesses' credibility and the weight of their testimony." *.39 Acres v. State*, 247 S.W.3d 384, 387 (Tex. App.—Texarkana 2008, pet. denied); *see City of Keller*, 168 S.W.3d at 819.

Paradigm also complains of the lack of evidence of the operational expenses used in calculating the payout date on the Giddings wells. Retamco used a baseline figure of $2,000.00 per month as the reasonable cost to operate each of the Giddings wells. Graham testified that his firm had been monitoring the drilling activity in the Giddings wells' area since 1987. He had performed audits of operators in the area, such as Anadarko and Union Pacific, for other owners of wells in the Giddings field. Graham had also owned working interests in wells in the Giddings field and had personal knowledge of costs to operate wells, and used that knowledge in conducting audits for compliance under operating agreements. The record thus supports the reasonable operational expense calculation attributable to the Giddings wells.

### 2. Reasonable Certainty of Damages

Paradigm also complains that Retamco's claims for lost overriding royalty interest revenue and back-in working interest revenue were not proved with a reasonable degree of certainty or supported by adequate data. Paradigm mentions two examples of faulty calculations including: (1) Graham's use of index prices for oil and gas, rather than actual prices available to

the Comptroller of Public Accounts; and (2) a disagreement over Thomas's characterization of properties as Class II rather than Class I properties. In view of the substantial and specific testimony contained in the record, we conclude this argument is without merit.

Though a plaintiff's figures need not be exact, they must approximate lost profits with "reasonable certainty." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). In order for lost profits to be established with reasonable certainty, evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree of exactness. *See id*. To be sufficient, the testimony "must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained" with "reasonable certainty." *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *compare id. with Aquila Sw. Pipeline, Inc. v. Harmony Explor., Inc.*, 48 S.W.3d 225, 246 (Tex. App.—San Antonio 2001, pet. denied) (holding petroleum engineer's evidence of lost profits as to two oil and gas wells was speculative where witness did not base his calculations on evidence of the historical profitability of the wells in question). In our prior opinion, this court critiqued the testimony from the only witness to testify, land man John Thomas:

> [Thomas] did no more than identify the general types of information he reviewed and relied upon, give an incomplete summary of the procedure he followed to make his calculations, and render a conclusory opinion on the amount of damages. Although the evidence shows Thomas examined facts and data that would be appropriate to consider in calculating damages, he failed to specifically identify any of the facts, failed to provide any of the data, failed to explain how the facts and data affected his calculations, and failed to show any of his calculations.

*Paradigm II*, 242 S.W.3d at 74–75. Thomas's testimony likewise suffered because his report and underlying data were not admitted into evidence. In our opinion, this court also identified the specific evidence necessary to support the damage award, including drilling and operating

costs, prices, and production used in the damage calculations and the specific wells and leases at issue. *Id.* at 75.

Unlike the prior hearing on damages, at the most recent hearing Retamco introduced substantial documentation and evidence on a per well basis to support the damages.[6] Graham provided detailed calculations of damages by relying on monthly sales volume reports filed by operators with the Railroad Commission and pricing information for gas from the twice-monthly published Houston Ship Channel Index with adjustments to reflect the differences in quality and heating values for Briscoe and Giddings production and post-production expenses. Not only Graham, but Thomas and Paradigm's president Carone stated that the Houston Index reflected a "reliable" price. The reductions from that price represent Graham's downward adjustment as a conservative approach to ensure Retamco was not overcompensated by using the maximum index price. Although he acknowledges that his numbers are not provided with absolute certainty, Graham reiterates that the calculations are within reasonable certainty. *See Szczepanik*, 883 S.W.2d at 649; *Tex. Instruments*, 877 S.W.2d at 279.

John Thomas is an experienced petroleum land man with substantial experience in reviewing leases, plats, and operation and production records. Thomas identified the percentage ownership in each well in which Retamco owned an interest under the 1984 Agreement. Thomas explained that the wells in question are not draining wells, they are not required wells, and they are not excluded properties under the 1984 Purchase Agreement. Therefore, based on his review of the documents, Thomas opined that each of the properties included in his report were properly classified as Class II properties in which Retamco maintained an overriding interest and a reserved working interest. He introduced his lengthy and detailed report into evidence in support

---

[6] Hundreds of exhibits contained in numerous binders were admitted by Retamco at the damages hearing that included detailed calculations of lost revenue on a per well basis.

of his damages testimony. Additionally, there is no evidence in the record that disputes his classification of the properties, and Laura Burney, an oil and gas expert, likewise substantiated the characterization of the properties as Class II. We, therefore, conclude that the evidence supports that the lost revenue damages are supported by adequate data and with sufficient certainty.

## TORT DAMAGES

### A. Economic Loss Rule

Paradigm next argues that the trial court abused its discretion in awarding tort damages because Retamco's fraud claim is truly a contract claim for which tort damages cannot be awarded. Specifically, Paradigm argues that the fraud claim stems from the back-in rights provided for in the 1984 Agreement, and the tort claims are not sufficiently independent from the breach of contract claims to support an award of damages.[7] The trial court found that the fraud damages were caused by Paradigm:

(1) failing to record the rights of Retamco to provide record notice to others of its property rights;
(2) improperly overstating costs or understating revenue on wells;
(3) offsetting or deducting items of expenses not actually incurred including costs of plugging and abandoning wells that were not plugged and abandoned;
(4) diverting proceeds due to Retamco to accounts created for Defendants' benefit; and
(5) charging unreasonable monthly producing well rates for overhead in excess of actual, reasonable overhead expenses.

Paradigm thus contends that because the fraud damages arise from rights under the 1984 Agreement, such damages are precluded by the economic loss rule. *S.W. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991). Retamco responds that the fraud allegations contained in its Fifth Amended Petition were deemed admitted pursuant to the partial default

---

[7] Paradigm also contends that the operating expenses for the wells were governed by joint operating agreements, which were not introduced into evidence. Without evidence of a joint operating agreement in the record, we cannot address this assertion.

judgment entered by the trial court. The fraud allegations in the petition included assertions that PNB and Paradigm defrauded Retamco by forging endorsements on Retamco's revenue checks; offsetting and deducting items of operating expenses not actually incurred, including costs of plugging and abandoning wells that were not plugged or abandoned; and charging unreasonable and unconscionable monthly producing well rates far in excess of actual or reasonable overhead expenses.

In reviewing the default judgment, we previously stated: "the default judgment therefore conclusively established, as alleged in the petition, . . . that Paradigm committed . . . fraud; and that Paradigm is jointly and severally liable with the other defendants for the damages caused by all of their . . . fraud." *Paradigm II*, 242 S.W.3d at 72–73. Thus, we previously recognized that Paradigm's liability for fraud was conclusive, but that Retamco would be required to establish the amount of damages attributable to the fraud.

In an analogous case, the El Paso Court of Appeals rejected a well operator's argument that the plaintiff, a working interest owner, was barred from any tort recovery because her claims sounded in contract. *Cass v. Stephens*, 156 S.W.3d 38, 68 (Tex. App.—El Paso 2004, pet. denied). In *Cass*, a working interest owner sued the operator of oil and gas wells for breach of contract, fraud, and conversion. *Id.* at 47–49. The plaintiff's allegations included that the operator made unauthorized expense charges on wells; overcharged expenses; and charged expenses incurred on wells owned by the operator to plaintiff's wells. *See id.* at 50–51. In rejecting the argument that the damages were contractual the court stated:

> [W]e reject the contention that Stephens' injury is contractual because she recovered economic damages. . . . Frank's fraud caused the joint interest owners to pay for goods and services they never received. Logically, their damages are economic-fraudulently induced payment of money results in money damages. We conclude that the injury is tortuous in nature.

*See id*. at 68–69. Thus, *Cass* clearly held that an agreement can create "a conduit for committing the torts, but the duty breached exists independent from the agreements." *Id*. at 69.

The record contained significant evidence to support the conclusion that Retamco's damages were attributable to fraud outside the 1984 Agreement. Several letters in evidence reflect Paradigm's executives' awareness of Retamco's reversionary interests. Yet despite such awareness, Paradigm recognized the negative impact of Retamco's interest on a sale price of its leases, and transferred its leases without any reference to the existence of such reversionary interests. There is evidence that Paradigm executives, Carone and McCallum, and their companies worked with PNB and intentionally acted to defeat Retamco's right to receive its reversionary interests under the 1984 Agreement. Thus, Paradigm fraudulently reported expenses to ensure the back-in interests never materialized. Retamco's petition describes, and the evidence supports, that Paradigm created a scheme to defraud Retamco of its back-in working interest revenue by overcharging and misstating expenses for which claims and damages are separate from the breach of contract claims. Based on the pleadings, the trial court's findings, and the evidence submitted at trial, we hold that Retamco's fraud claim supported damages independent from Retamco's breach of contract claim.

## B. Fraud Damages

Paradigm argues that the fraud damages awarded do not conform to an accepted legal standard.

> Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received.

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) (citations omitted); *see also Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam) (observing that out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory"). A plaintiff may recover either the out-of-pocket or the benefit-of-the-bargain damages, whichever is greater. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).

Paradigm argues that Retamco's back-in working interest damages are limited to the difference between the value it parted with and the value it received. As such, Paradigm claims there is no evidence that Retamco parted with any value, i.e., that it paid the overstated operating expenses, in connection with Paradigm's alleged misrepresentation of operating expenses. Paradigm further asserts that the trial court erred in awarding all of Retamco's back-in working interest revenues, as opposed to the difference between the over charged amounts and what was reasonable. Moreover, because Retamco was required to pay some operating expenses, the entire lost revenue from the back-in working interest cannot be causally linked to Paradigm's alleged fraudulent activities.

In response, Retamco points to Graham's testimony regarding his calculations of the working interest revenues that were "net" figures taking into account past and on-going lease expenses. Thus, the trial court awarded damages based on lost working interest revenue less reasonable operating expenses. Retamco further argues Graham's damage calculations were a classic benefit-of-the-bargain calculation—Graham calculated the difference between the value of working interest revenues represented by Paradigm which amounted to nothing, and the value of the revenues Retamco would have collected ***but for*** Paradigm's fraud. Retamco's model is appropriate. Because Graham's calculations are based on the difference between the value of the

interests represented by Paradigm to Retamco and the value received by Retamco, they constitute direct damages for fraud. *See Formosa Plastics*, 960 S.W.2d at 49.

## C. Lack of Causal Nexus for After-Payout Working Interest Tort Damages

Finally, Paradigm argues that the vast majority of the back-in working interest damages, attributable to fraud, were incurred when Paradigm was not involved in the lease operations. For example, after March 2000, the Briscoe Lease was operated by other third parties. Thus, Paradigm argues it did not and could not charge excessive operating expenses for the Briscoe Lease wells after March 2000. Furthermore, Paradigm claims that Retamco put on evidence of excess operating expenses only for the years 1993–1999 and therefore, there is no basis for tort damages based on fraud prior to January 1, 1993, or after January 1, 2000. As will be discussed in more detail below, the allegations in Retamco's petition regarding fraud, including allegations of joint and several liability under theories of conspiracy and joint enterprise/venture, were deemed admitted. Based on the evidence, the trial court could have concluded that Carone and Paradigm were working with PNB and never intended Retamco's working interests to vest. The fraud damages awarded were based on a model that examined when Retamco's working interests would have vested absent fraud and how much revenue would have been received. Both Graham and Thomas provided detailed testimony of the interests and revenue that Retamco would have received absent the fraud of Paradigm. We overrule this issue.

## D. Harm Not Proximately Caused by Paradigm

Continuing its complaints about the damages award, Paradigm argues that Retamco failed to establish that Paradigm proximately caused its damages. *See Paradigm II*, 242 S.W.3d at 72. Retamco's damages are based on its overriding royalty interests and back-in working interests; which are interests in real property. *Matagorda County Appraisal Dist. v. Coastal Liquids*

*Partners, L.P.*, 165 S.W.3d 329, 332 (Tex. 2005). Paradigm argues that its duty to pay Retamco could only arise when Retamco and Paradigm owned interests in the subject leases at the same time because only then would Paradigm have a legal duty to Retamco. Paradigm maintains that there were a series of conveyances that show as a matter of law that Retamco recovered damages for interests it no longer owned and at a time when Paradigm had no interest in the leases. Before discussing this issue further we must point out again the unusual construct in which the damages were presented. At trial, the trial court did not admit any of the conveyances relied upon by Paradigm due to the death penalty sanctions, but in order to understand Paradigm's argument we will describe the pertinent conveyances below.[8]

### 1. The Briscoe Ranch Conveyances

The damages awarded relating to the Briscoe Lease cover a time period from 1986 to 2017 in some instances. Paradigm attacks these damages because (1) Retamco assigned its entire interest in the Briscoe Lease as early as March 16, 1994, and no later than January 1, 2000;[9] and (2) Paradigm did not own or operate any interest in the Briscoe Lease after March 1, 2000.[10] Consequently, Paradigm argues it cannot be liable to Retamco for working interests it conveyed to others at least by 2000.

### 2. The Giddings Lease Assignment

The Giddings Lease damages cover a period from approximately 1994 into the future. Paradigm attacks these damages because: (1) Retamco assigned all of its interest in the Giddings Leases effective March 31, 2006; (2) Paradigm assigned its interests to third parties effective

---

[8] Paradigm attached the various assignments and conveyances to a request for judicial notice.

[9] Retamco claims the 1994 assignment was void and never implemented.

[10] Paradigm assigned its interest in the Briscoe Lease to Crimson Energy, L.P. in 2000, but did not disclose Retamco's reversionary interests in the document.

January 1, 2000; and (3) Paradigm never owned many of the Giddings Leases for which damages were awarded.[11]

### 3. Damages Prior to Paradigm's Acquisition

Paradigm points out that it did not acquire any of the subject properties until May 1993, when PNB sold sixty-two wells to Paradigm under the terms of an Asset Purchase Agreement. Paradigm argues that it assumed the obligation to pay revenues only on the sixty-two leases covered by the 1984 Agreement from January 1, 1993, forward. Furthermore, the remaining 510 leases, which specifically acknowledged the interests held by Retamco, were transferred in 1985 to Clements Energy. Therefore, Paradigm could not have caused harm before 1993 or in excess of the sixty-two leases it acquired. Retamco disputes Paradigm's interpretation of the Clements' purchase and points to the Clements assignment that was not made subject to Retamco's rights and therefore, according to Paradigm, PNB remained fully responsible to Retamco on all the leases conveyed under the 1984 Agreement.

### 4. Effect of Death Penalty Sanctions

The death penalty sanctions awarded in this case preclude much of Paradigm's arguments. Under the terms of the Default Judgment, Paradigm "may not, and [is] disallowed to, oppose Plaintiff's claims of breach of contract and fraud, fraudulent concealment, accounting, conspiracy, alter ego, joint enterprise liability, claims to overriding royalty interests, damages, exemplary damages, pre-judgment interest or attorney's fees whether by cross examination, objection to evidence offered, or offer of evidence . . . ." As a result the trial court did not admit any of the underlying assignments and conveyances that would support Paradigm's factual assertions. Paradigm claims the trial court erred by not admitting the pertinent documents under a request for judicial notice.

---

[11] Paradigm transferred its Giddings well leases to Republic Drilling Co. and Douglas McCallum.

Specifically, Paradigm requested that the trial court take judicial notice of six conveyances affecting the Briscoe and Giddings Leases because public records are adjudicative facts of which the trial court shall take judicial notice "if requested by a party and supplied with the necessary information." *See* TEX. R. EVID. 201(d). Judicial notice, however, is a matter of evidence. *See Burtis v. Butler Bros.*, 226 S.W.2d 825, 830 (Tex. 1950). Retamco argues that the sanctions order prohibits Paradigm from offering evidence and their judicial notice argument is simply a means of circumventing the sanctions. We agree. Paradigm offered the exhibits during the hearing on the settlement credits and argued that the documents were evidence of a lack of causal nexus. In reality, Paradigm was attempting to limit its liability and circumvent the death penalty sanctions. Accordingly, the trial court did not err in failing to take judicial notice of the conveyances or admitting them into evidence.

In addition to the failure to admit the conveyance documents Paradigm relies upon to establish the lack of a causal connection, the default judgment conclusively established Paradigm's liability, including "that Paradigm assumed all of PNB's obligations under the 1984 contract; . . . and that Paradigm is jointly and severally liable with the other defendants for the damages caused by all their breaches of contract and fraud."[12] *Paradigm II*, 242 S.W.3d at 72–73. Thus, the issue of which obligations were assumed by Paradigm under the 1984 Agreement, and when they arose have been established. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984) (all causes of action and facts pled are established in default judgment). Because Paradigm is jointly and severally liable with PNB, the evidence supports damages that accrued before Paradigm acquired its leases and after it transferred its interests.

---

[12] Retamco pled joint and several liability based on conspiracy, joint enterprise/venture, successor liability, and alter ego theories.

Finally, many of Paradigm's arguments misconstrue the nature of the damages awarded. The trial court did not award specific back-in working interests or overriding royalty interests that are currently owned by third parties. The damage model was based on the loss of those interests and resulting loss of revenue caused by Paradigm's fraudulent accounting, conspiracy with PNB, and failure to abide by the 1984 Purchase Agreement. Absent Paradigm's actions, Retamco introduced evidence that it would have received revenue from its working interests earlier and would not have conveyed its interests for less than their value. Specifically, Gose testified that he learned that Crimson was seeking to sell its interest in the Briscoe Lease to Huber Energy. Because Gose had yet to receive any royalties from the property, Gose wrote Crimson advising them of Retamco's interest in the lease. Crimson sued Retamco for slander of title because it was unaware of Retamco's interest due to Paradigm's effort to conceal Retamco's interest from others. Paradigm refused to provide the payout data to Retamco to establish to Crimson's satisfaction the extent of its back-in working interest. Because Crimson was a bona fide purchaser for value, Gose had to settle by assigning its rights to Crimson. However, Gose testified to the reasons why Retamco transferred its reversionary interests to Crimson under the Briscoe Lease. Gose made certain that the parties put in the assignment and settlement agreement that Retamco was not waiving or releasing any claims it had against Paradigm.

## EXEMPLARY DAMAGES

Because the "actual damages sustained from a tort must be proven before punitive damages are available," Paradigm claims that Retamco is not entitled to punitive damages. *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995). Furthermore, a breach of contract can never support punitive damages, even in the face of intentional conduct or malicious acts. *Manges v. Guerra*, 673 S.W.2d 180, 184 (Tex. 1984). However, in light of our determination

that the actual damages were legally and factually sufficient, and the damages were properly awarded under fraud, we need not address these issues further.

Paradigm states, however, that even assuming tort damages, there is insufficient evidence to conclude that the trial court considered any of the facts required by section 41.011 of the Texas Civil Practice and Remedies Code for imposing exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.011 (Vernon 2008).[13]  Moreover, even if the court did consider the factors, Paradigm argues that this case does not merit exemplary damages because the harm caused was purely economic, did not implicate any health or safety concerns, and Retamco was not financially vulnerable.  *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006).  However, "[e]xemplary damages are recoverable when the injury is tainted with fraud, malice, or willful wrong."  *Cheek v. Humphreys*, 800 S.W.2d 596, 599 (Tex. App.—Houston [14th Dist.] 1990, writ denied).

We note that Paradigm does not argue that the exemplary damages are excessive or challenge the trial court's findings of fact relating to the exemplary damages.  Moreover, as Retamco points out, this case is more than mere breach of contract.  To the contrary, Retamco argues that this case "involves purposeful fraud and conspiracy to commit fraud that was deemed admitted and overwhelmingly proven at trial and is now the subject of unchallenged fact-findings on appeal."  Once again, we agree.  There was evidence that Paradigm forged

---

[13]  The trial court expressly considered the factors listed in the Civil Practice and Remedies Code in its finding of facts.  Texas Civil Practice and Remedies Code section 41.011 provides as follows:
  (a) In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any,
  relating to:
      (1) the nature of the wrong;
      (2) the character of the conduct involved;
      (3) the degree of culpability of the wrongdoer;
      (4) the situation and sensibilities of the parties concerned;
      (5) the extent to which such conduct offends a public sense of justice and propriety; and
      (6) the net worth of the defendant.
  (b) Evidence that is relevant only to the amount of exemplary damages that may be awarded is not
  admissible during the first phase of a bifurcated trial.
TEX. CIV. PRAC. & REM. CODE ANN. § 41.001 (Vernon 2008).

endorsements on Retamco's revenue checks and deposited them into its accounts; that Paradigm engaged in a multi-year plan of grossly inflating operating expenses to ensure the back-in working interests would not vest; and misrepresented its activities and ownership to avoid paying Retamco its revenues. There is clearly sufficient evidence upon which the trial court could find that Paradigm's misconduct was malicious, fraudulent, or reprehensible. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.011; *BMW of N. Am. v. Gore*, 517 U.S. 559, 576 (1996); *Chapa*, 212 S.W.3d at 308. Accordingly, this issue is overruled.

## ATTORNEY'S FEES

Paradigm next argues that the trial court erred in awarding attorneys' fees because the 1984 Purchase Agreement contains a California choice of law provision. Paradigm claims Retamco is not entitled to enforce the attorney's fee provision contained in the 1984 Agreement because none of the Appellants were parties to the 1984 Purchase Agreement.[14] Accordingly, under California law, Retamco cannot enforce the attorney's fees provision against Paradigm because Paradigm was not a party to the original contract. *See Glynn v. Marquette*, 152 Cal. App. 3d 277, 280 (1984) (holding that award of attorney's fees under California law requires an express assumption of the contract). Because, according to Paradigm, it is neither an "assign" nor a "successor," the trial court erroneously ordered attorney's fees against Paradigm. This argument is without merit.

Paradigm neither requested the trial court take judicial notice of California law nor alerted it to any discrepancies between California and Texas law. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 695 (Tex. 2006) (Brister, J., dissenting) ("When a party fails to request judicial notice of the law of another state as permitted under Rule 202, 'Texas courts will

---

[14] Section 8.13 of the 1984 Agreement provides in part: "In the event any party hereto shall institute any action or proceeding against any other party hereto . . . the losing party shall pay to the prevailing party reasonable attorneys' fees, costs, and expenses incurred by the prevailing party."

simply presume that the law of the other state is identical to Texas law.'" (quoting Olin Guy Wellborn III, *Judicial Notice Under Article II of the Texas Rules of Evidence*, 19 ST. MARY'S L.J. 1, 27 (1987))); *see also Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc.*, 235 S.W.3d 287, 290 (Tex. App.—Fort Worth 2007, pet. withdrawn). Thus, a presumption existed that California law on attorney's fees is identical to Texas law. More importantly, however, Paradigm's sanctions, specifically the judicial admissions, provide that Retamco is entitled to attorney's fees. The default judgments "conclusively established" that, as alleged in the petitions, Paradigm is liable for Retamco's attorney's fees. *See Paradigm II*, 242 S.W.3d at 72–73; *Burlington N. & Santa Fe Ry.*, 235 S.W.3d at 290–91.

SETTLEMENT CREDITS

Finally, Paradigm argues that the trial court erred in failing to apply the settlement credits.

## A. Standard of Review

A trial court's determination of the existence or amount of a settlement credit is reviewed for an abuse of discretion. *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W .3d 307, 326 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *Walker v. Gutierrez*, 111 S .W.3d 56, 62 (Tex. 2003). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co., v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

**B.  Joint and Several Liability**

Under the one-satisfaction rule, a party cannot "obtain[] more than one recovery for the same injury."  *Stewart Title Gaur. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991).  Chapter 33 of the Texas Civil Practice and Remedies Code governs settlement credits in all tort actions.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a) (Vernon 2008) (providing that Chapter 33 applies to "any cause of action based on tort in which a . . . settling person . . . is found responsible for a percentage of the harm for which relief is sought").  Section 33.012(b) of the Code provides, "If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements."  TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(b) (Vernon 2008).  This statute is mandatory.  *Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 906 (Tex. 2005).  A non-settling defendant has the burden to prove the existence and amount of a settlement credit, and may do so by placing the settlement agreement or some other evidence of the settlement amount in the record.  *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002) (op. on reh'g); *see also Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998) (holding that non-settling defendant can meet its burden of proof "by placing the settlement agreement or some evidence of the settlement amount in the record").

The non-settling defendant is entitled to offset any liability for joint and several damages by the amount of common damages paid by the settling defendant, but not for any amount of separate or punitive damages paid by the settling defendant.  *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391–92 (Tex. 2000) (op. on reh'g); *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 684 (Tex. App.—Austin 2005, no pet.); *Texas Capital Sec., Inc. v. Sandefer*, 108 S.W.3d 923, 926 (Tex. App.—Texarkana 2003, pet. denied).  The non-settling defendant,

however, may only claim a credit based on the damages for which all tortfeasors are jointly liable. *Casteel*, 22 S.W.3d at 390–92; *CTTI Priesmeyer*, 164 S.W.3d at 684–85.

The issue thus becomes from whom the non-settling defendant may claim a credit. "If the independent tortuous conduct of two or more persons is a legal cause of an indivisible injury, each person is jointly and severally liable for the recoverable damages caused by the tortuous conduct." RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY §§ A18, 10, cmt. b (2000). Likewise,

> when there is no concert or unity of design and two people are acting independently and tortuously causing distinct harm for which there is reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

*Century 21 Page One Realty v. Naghad*, 760 S.W.2d 305, 310 (Tex. App.—Texarkana 1988, no writ) (citing RESTATEMENT (SECOND) OF TORTS § 881 (1979)). We must, therefore, address each entity for which Paradigm seeks a settlement credit to determine if they are "jointly and severally liable" under the default judgment.

## C. Analysis

Paradigm alleges that Retamco obtained settlements from Bank of America in the amount of $1.25 million, Crimson Energy Company, L.P. in the amount of $400,000.00 and Anadarko in the amount of $925,000.00, for a total of $2,575,000.00 in settlement credits. Paradigm argues that these settlement monies stem from the same injury and the same revenue stream for which the trial court awarded damages. Retamco responds that Paradigm failed to show that Paradigm and the settling parties were jointly and severally liable for the damages covered by the settlement agreements. Yet, as Paradigm points out, Retamco cannot be heard to argue in every other aspect of this case that Paradigm is jointly and severally liable for the acts of the other defendants and not so with regard to settlement credits.

*1. Bank of America Settlement*

We note that Retamco named Bank of America as a defendant. PNB was a subsidiary of SPNB, which was, in turn, purchased by Bank of America. More specifically, in Plaintiff's Fifth Amended Original Petition, Retamco named Bank of America ***as a defendant*** that failed to pay or underpaid royalties owed to Retamco. Retamco's pleadings support that Bank of America was, in fact, a successor and assign under the 1984 Agreement. Thus, as an assignee of Paradigm, Bank of America was a settling party and the trial court should have reduced the amount of damages to be recovered by Retamco by the $1,250,000.00 received from Bank of America. *See* TEX. CIV. PRAC. & REM. CODE § 33.012(b). The trial court, therefore, erred in failing to award the requested settlement credit with regard to Bank of America.

*2. Crimson Energy and Anadarko Settlements*

The trial court, however, could have reasonably concluded that Crimson Energy and Anadarko E & P Company, L.P. were not jointly and severally liable for the damages in question. *Casteel*, 22 S.W.3d at 390–92. Retamco named neither party as a defendant in its original suit against Paradigm and offered no testimony linking Crimson Energy or Anadarko as parties joining with Paradigm to produce the common injury. *See Amstadt v. U.S. Brass Corp*., 919 S.W.2d 644, 654 (Tex. 1996) (explaining that joint and several liability may be imposed when the actions of two or more entities join to produce an indivisible injury, but not when the injuries can be apportioned with reasonable certainty). There was no evidence that either Crimson Energy or Anadarko were part of Paradigm's scheme causing injury to Retamco. *See BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 456 (Tex. App.—San Antonio 2008, pet. filed); *CTTI Priesmeyer*, 164 S.W.3d at 685–86. Additionally, the Crimson Energy settlement arose out of a lawsuit filed by Crimson Energy against Retamco for tortuous interference with contract

and the Anadarko lawsuit involved none of the Paradigm defendants and contained no allegations of fraud. Additionally, neither the Crimson Energy nor the Anadarko settlements were simple settlements that specifically related to issues in this case. Thus, the trial court could have reasonably concluded that the foregoing settlements were attributable to other issues between Crimson Energy and Anadarko that did not stem from Paradigm's, or its assigns' or successors', actions. *See Casteel*, 22 S.W.3d at 390–92.

Accordingly, we overrule Paradigm's argument with regard to application of the settlement credits from the Anadarko and Crimson Energy settlement agreements, but sustain Paradigm's argument with regard to Bank of America. Accordingly, the trial court should have awarded a settlement credit of $1,250,000.00 against the damages.

## CONCLUSION

Based on the overwhelming evidence before the trial court, we conclude that the evidence is both legally and factually sufficient to support the trial court's award of compensatory and exemplary damages. We further conclude that the trial court properly held that Retamco was entitled to recover damages based on fraud and attorney's fees based on the sanctions award and the presumption that California law is identical to Texas law. We uphold the trial court's denial of settlement credits with regard to Crimson Energy and Anadarko. But because Bank of America is jointly and severally liable with the Paradigm appellants, based on the law of the case, we reverse the trial court's failure to apply a credit in the amount of $1.25 million regarding Retamco's settlement with Bank of America. We affirm the judgment of the trial court in all other aspects.

Rebecca Simmons, Justice