02-09-095 & 233-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00095-CV

NO. 02-09-00233-CV

 

 


 
 
 IN
 THE ESTATE OF DORIS
 ROSE
 PRESTON, DECEASED
 
 


 

 

------------

 

FROM THE Probate
Court OF Denton COUNTY

------------

OPINION

------------

I.  Introduction

          Doris
Rose Preston died intestate in Denton County on August 27, 2005.  After Appellant
Scherry J. Levi filed an application for letters of administration in December
2005 seeking to be appointed administratrix of Doris’s estate, three and a half
years of what the trial court described as “extensive,” “miserable,” and “tortured”
litigation followed.  These appeals stem from a large part of that litigation,
in which the trial court ultimately entered death penalty sanctions against
both Scherry and Appellant Michael B. Preston.

          In
cause number 02-09-00095-CV, Scherry and Michael raise nine issues, challenging
an amended final default judgment in favor of Appellee Deartis Preston.  In cause
number 02-09-00233-CV, Scherry and Michael raise eight issues, challenging a
final judgment in favor of Stephen E. Dubner, successor administrator of the
estate of Doris Rose Preston, and Western Surety Company.[1]
 We will modify the judgments in both causes and affirm the judgments as
modified.

II.  Factual and Procedural Background

          A.      People

          Doris,
Scherry, Michael, and Gwendolyn are siblings.  Deartis is Gwendolyn’s biological
son, but Doris adopted Deartis sometime around 1985.[2]
 Deartis is the sole heir to Doris’s estate.  Gwendolyn has another child, Eva,
Deartis’s sister.  Doris, Deartis, Eva, and Gwendolyn lived together in Denton
County until Doris died in August 2005.[3]

          B.      2006
Pleadings and Proceedings

                   1.       Ad Litem
Appointed

          The
trial court appointed Gretchen Benolken attorney ad litem and guardian ad litem
of Deartis in January 2006.  The estate matter was designated cause number
PR-2005-00802.

                   2.       March
13, 2006 Prove-up Hearing

          On
March 13, 2006, at the prove-up hearing on Scherry’s December 2005 application
for letters of administration, Scherry testified that at the time of Doris’s death,
she owned a house in Bay City, Texas (the Austin Street house); a 2004 vehicle;
several bank accounts containing approximately $20,000; and a teacher
retirement account.  According to Scherry, Doris also owned two certificate of
deposit accounts—one worth approximately $79,000 and another worth
approximately $49,000—that she had “entrusted” to Scherry and Michael “[t]o
take care of Deartis . . . , to make sure that all of his
medical things are taken care of, anything that he might need, you know, so
that he’ll be happy and comfortable the rest of his life.”  When asked whether
the accounts were “joint with right of survivorship or payable on death,” Scherry
responded, “All I know is that . . . the one that was in my name was
placed in my name and the one that Michael’s name was on was placed in his name
because his name was on that one and my name was on the other one.”  Scherry explained
that her family had decided to relocate Deartis, Gwendolyn, and Eva to Bay City,
where Scherry lived; that Eva had been acting as the primary caregiver for
Deartis since Doris died and would continue in that role on a day-to-day basis;
and that the funds in the accounts that Doris had allegedly entrusted to Scherry
and Michael would be used for Deartis’s benefit.  Michael, who lives in Los
Angeles, testified that “[t]he moneys that were entrusted to me are entrusted
to take care of our family.  That would be Eva, Gwen, Deartis . . . .”

          At
the conclusion of the hearing, the trial court expressed that it had questions
about the status of the two accounts that Doris had allegedly entrusted to
Scherry and Michael and that were now in their names.  The trial court said,

          I’m trying
to determine in my mind and I’m not so sure that it’s clear in anybody’s mind
if these accounts were convenient accounts, were they beneficiary accounts,
were they accounts like trust accounts for the use and benefit of Deartis or
were they moneys given to her sister and brother?

 

          I
believe the family is going to do what the family says, but I’m trying to
determine:  If that’s part of the estate, I’ve got to bond it; if it’s not part
of the estate, then I’m not concerned about it.

 

Scherry’s
counsel responded that “if the bank transfers it into another person’s name,
it’s probably based on a -- some kind of beneficiary or joint tenant with
right of survivorship designation and we don’t -- and that that would not
be a probate asset.”  Benolken, however, stated that this was the first time
that she had heard that those accounts existed and that she shared the trial
court’s concern about their status.  The trial court signed an order
authorizing letters of dependent administration that appointed Scherry
administratrix of Doris’s estate and set a bond at $100,000.

                   3.       Amended
Ad Litem Order

          On
March 22, 2006, the trial court signed an amended order appointing Benolken
guardian ad litem and attorney ad litem of Deartis.  The order
provided that Benolken was “to be given access to all of DEARTIS PRESTON’s
financial, medical, psychological, and intellectual testing records.”

                   4.       April
12, 2006 Hearing—Motion to Reduce Bond

          On
April 12, 2006, the trial court held a hearing on Scherry’s motion to reduce
the bond.  Scherry testified that she knew she was supposed to obtain a
$100,000 bond but that she had not yet done so, that the two accounts that
Doris had allegedly entrusted to her and Michael had each been held by Doris at
First Bank, and that neither she nor Michael had withdrawn those funds from
their respective accounts.  Scherry specifically acknowledged that as the
administratrix for the dependent administration of Doris’s estate, all of her
actions must be taken with court approval.  In her closing argument, Benolken
addressed the still-unanswered question about whether the funds in the two
First Bank accounts were part of Doris’s estate or whether they were properly paid
to Scherry and Michael as non-probate assets, stating that “[t]here is no
evidence that anyone has converted a penny.  However, if the legal arguments
that I have identified are correct . . . , just the fact that
they’ve been paid over . . . could be a basis of a conversion claim.” 
The trial court declined to reduce or increase the bond from $100,000.  Western
Surety Company later issued Scherry a bond in the amount of $100,000.

                   5.       Amended
Order Clarifying Benolken’s Appointment

          In
July 2006, the trial court signed an agreed amended order clarifying Benolken’s
appointment and duties as the attorney and guardian ad litems of Deartis. 
Among other things, the order provided that Benolken had the power to prosecute
ancillary proceedings “to effectuate the protection of Deartis Preston and his
rights, claims and assets” and that Benolken

is to be given access
to and shall review all records of Doris Preston’s assets and/or liabilities
and/or those of her Estate, including, but not limited to copies of signature
cards, controlling agreements, and all records regarding Doris Preston’s
banking and investment accounts of any nature, and that any and all relatives
of Doris Preston and any [] and all financial institutions in which she
maintained any such assets hereby are ORDERED to produce such records to
[Benolken] at her request.

 

                    6.       Inventory
and Appraisement

          Scherry
filed an inventory, appraisement, and list of claims on November 1, 2006,
almost a year after she filed her application for letters of administration. 
The filing listed the total value of Deartis’s property at the time of her
death at $67,242.86.  It did not, however, include values for the two First
Bank accounts that Doris had allegedly entrusted to Scherry and Michael.

                   7.       New
Guardian Ad Litem and Power of Attorney

          In
November 2006, the trial court appointed Angela Miller guardian ad litem
for Deartis.  Benolken remained Deartis’s attorney ad litem through the pendency
of the litigation.  At a hearing on a motion for instructions, Scherry
disclosed for the first time that she had obtained a power of attorney for
Deartis with the help of an attorney who was located in Bay City and who had no
other connection to this case.[4]

                   8.       Complaint
Regarding Production of Documents

          On
November 13, 2006, Benolken filed a “Complaint Requesting Additional Inventory
and Imposition of Constructive Trust” on behalf of Deartis.  The complaint stated
that Scherry had not turned over financial information regarding the assets of
Doris’s estate and that there was concern about the inventory and appraisement
that Scherry had filed because it omitted the two First Bank certificate of
deposit accounts that were paid to Scherry and Michael.[5] 
Further, because “there have surfaced certain legal issues evidencing a bona
fide dispute” regarding whether the First Bank “[a]ccounts were properly assets
of the Estate as opposed to being disposed of by Decedent through
non-testamentary dispositions to her brother and sister via joint accounts with
right of survivorship and/or payable on death accounts,” the complaint requested
that the trial court impose a constructive trust on “any and all monies that
were distributed” from the First Bank accounts “until such time as the Court
can make a determination as to whether the monies in the [a]ccounts should be
brought into the Estate because the account agreements do not contain the
necessary elements required by Tex. Prob. Code §§439 and 439A.”

                   9.       Motion
to Compel

          On
December 8, 2006, Benolken filed a motion to compel on behalf of Deartis, stating
that she had requested in writing financial information of Doris and Deartis
but that she had “received absolutely nothing in response.”[6]
 Benolken prayed that the trial court order Scherry to respond to Benolken’s
requests for documents.

          C.      2007
Pleadings and Proceedings

                   1.       Deartis’s
Original Petition

          On
January 19, 2007, Benolken filed an original petition (cause PR-2005-00802-01)
on behalf of Deartis against Scherry and Michael, averring that Scherry and
Michael had improperly received the funds from the First Bank accounts.[7]
 Deartis alleged claims for declaratory relief, constructive trust, and money
had and received related to the funds.[8]

                   2.       January
19, 2007 Hearing—Motion to Compel

          On
January 19, 2007, the trial court conducted a hearing on Deartis’s motion to
compel regarding Scherry’s failure to produce documents.  At the outset of the
hearing, the trial court questioned why Benolken’s requests for documents had
gone largely unanswered by Scherry,

[T]he Court’s duty is
to see to it that that incapacitated heir receives whatever the incapacitated
heir is supposed to receive, and usually that’s through the efforts of --
of these ad litems. . . .

 

            . . . .

 

          . . .
I’m at a point of some confusion, I admit.  I’m at a point of some
misunderstanding or -- or at least inability to understand why this
process of reviewing the status of this estate and being certain that Deartis
Preston, the incapacitated heir, is receiving what he’s supposed to in a
structure that’s legally cognizable has turned into such a fight.  I don’t
understand that.

          Michael
testified that he had a signature card and several financial documents
regarding the disputed First Bank account that had been paid to him and that he
would turn the documents over to his attorney.  He said that of the
approximately $72,000 that First Bank had transferred to him, about $30,000 had
already been used for a down payment on a house that was purchased in Bay City
(the Sailfish house) for Deartis, Gwendolyn, and Eva.[9]
 Michael said that the Sailfish house was titled in both Scherry’s and Deartis’s
names.  Further, of the $72,000, another $5,000 each was paid to Scherry and
Artis (another Preston sibling) to pay for attorneys’ fees.  Michael opined
that about $52,000 had been spent from the First Bank account.  In terms of
handling Doris’s estate matters, caring for Deartis, and turning over documents,
Michael agreed with the trial court that his family had “informal or extralegal
kind[s] of arrangements and these are based on -- on a moral obligation
between family members.”

          Scherry
testified that title to the Sailfish house was partly in her name because
Deartis had no credit in his name, and she agreed to turn over certain bank
statements, financial documents, and closing documents that were in her
possession.  Scherry testified that she had not spent any of the funds that
Doris had left her in the First Bank account.

          At
the conclusion of the hearing, the trial court stated that the issue of whether
the funds in the First Bank accounts were nonprobate assets belonging to
Scherry and Michael “must be resolved.”  Regarding how Scherry and Michael were
handling matters related to Doris’s estate, including responding to discovery
requests and turning over documents, the trial court stated the following:

          And I
realize that [Michael] and [Scherry] have both made it clear to the Court that
these long-standing, tradition-based family obligations that they have
undertaken are very serious to them and that they believe they should live up
to those obligations and live under those obligations and follow them in the
interest of Deartis, and I respect that.  I respect that.  However, it lacks
legal cognizability and structure, and the Court’s duty -- no matter what
the family’s legal and ethical and moral undertakings are, it is the Court’s
duty to see that the incapacitated heir is protected not just morally and
ethically, as I believe is certainly happening with this family, but also
legally.

                   3.       January
25, 2007 Hearing—Motion to Compel

          On
January 25, 2007, the trial court continued the hearing on Deartis’s motion to
compel but granted Scherry’s motion for a continuance on the matter.  Scherry’s
attorney stated that neither Scherry nor Michael had given him any of the documents
referenced in the January 19, 2007 hearing, and he agreed with the trial
court’s assessment that Scherry had “different ideas about the need for a
structured arrangement in the handling of this matter for the incapacitated
heir” and that, in her opinion, “the informal family arrangements based on
moral and ethical obligations” should “be unfettered by the . . . unnecessary
intrusions of the law.”  The trial court stated that Scherry’s and Michael’s
familial arrangements to address Doris’s estate and to “take care of Deartis” were
“foreign arrangements to the legal system.  While they may very well be based
on bona fide moral, ethical family ties and connections, they have no
enforceability associated with them, and the Court has to require the
administration of an estate in accordance with the law.”  The trial court opined
that in light of Benolken’s continuing difficulty in obtaining documents, “by
the time these ad litems get through protecting Deartis, Deartis won’t
have anything to protect, . . . so this is a difficult and untenable
situation.”

                   4.       Original
Answer and Third Party Claim

          In
early February 2007, Scherry and Michael filed their original answer and a
third party claim against First Bank in the action filed by Deartis.  They alleged
that they were entitled to be indemnified by First Bank if the funds in the disputed
accounts did not belong to them.

                   5.       Order
Granting Motion to Compel

          On
February 23, 2007, the trial court signed an order granting Deartis’s motion to
compel.  The order stated that Scherry had “wholly failed to respond to
[Benolken’s] requests for documents as ordered to be made available to
[Benolken] by Order of this Court dated July 17, 2006,” and it required both
Scherry and Michael to “produce all documents responsive to Ad Litem’s
request for documents.”  The order also required Scherry and Michael to
“preserve the status quo as to all assets” that are part of Doris’s estate and
that are the subject of the ancillary lawsuit filed by Deartis against Scherry
and Michael.

                   6.       March 1, 2007 Hearing

 

          At
a hearing on March 1, 2007, Benolken acknowledged that Scherry’s attorney had
given her a “stack of documents” that Scherry and Michael had produced but that
Scherry and Michael had still not turned over the documents detailed by the
July 17, 2006 order.  Scherry testified briefly that she had given “what [she]
had” to Benolken.  The trial court mentioned that Miller had filed an
application for guardianship for Deartis.

                   7.       Second
Order Granting Motion to Compel

          On
March 14, 2007, the trial court signed a second order granting Deartis’s motion
to compel.  The trial court found that Scherry had failed to respond to
Benolken’s requests for documents as ordered by the trial court on July 17,
2006, and on February 23, 2007, and it required Scherry and Michael to produce
all originals and copies of documents pertinent to Doris’s estate case and
Deartis’s suit against Scherry and Michael.  The order set a hearing for April
19, 2007, to show cause whether Scherry had complied with the order and, if she
had not, to determine whether she should be held in contempt of court.

                   8.       April
19, 2007 Hearing—Show Cause

          Benolken
called Miller to testify about the noncompliance with the trial court’s orders.
 Miller testified that although certain documents had been turned over, Scherry
had not complied with the July 2006 agreed amended order clarifying Benolken’s
appointment; the February 23, 2007 order on motion to compel; and the March 14,
2007 second order on motion to compel.  Regarding the Sailfish house, Miller
testified that Scherry had turned over only the front page of the warranty
deed, had not turned over the entire “closing packet” from the title company,
and had not turned over the note or any of the financing documents.  As for Doris’s
bank statements, Scherry had turned over some handwritten “summaries” instead
of the actual statements or copies thereof.  Miller opined that Scherry had not
turned over “sufficient detail” of Doris’s teacher retirement account and had
not produced “information concerning disability benefits.”  Miller also opined
that it was not possible to determine what monies of Doris’s estate had been
spent or to analyze Deartis’s personal money based on the documents that had
been turned over.  Miller testified that Scherry was the person with control
over all of the records that were in Doris’s house.  On rebuttal, Miller
recalled that Scherry did not want to permit Benolken to review all of the
requested documents at Scherry’s attorney’s office because it would “cost
thousands of dollars.”

          Scherry
testified that she had produced the documents that were in her possession, that
she had “sent the documents that [she] thought [Benolken] wanted,” and that no
records regarding Doris’s teacher retirement account had been given to her, but
she admitted that she had not produced all relevant bank statements and banking
records for Deartis, that only part of the documents regarding the Sailfish
house had been produced, that she had not produced an Atlanta Life Insurance
policy, that she had not turned over documents relating to Deartis’s Social
Security benefits, and that she had not permitted Benolken to see any original
documents.  Scherry also testified that she had used estate funds to pay for a
storage space and that she had spent $13,000 of the funds from the First Bank
account to pay off Doris’s car.  There was no evidence that Scherry had
obtained the trial court’s permission to spend estate money.

          At
one point during the hearing, the trial court acknowledged that Michael had “no
personal duty or obligation to be before” the trial court because he was not
the administrator and was not an applicant for guardianship.  The trial court then
stated,

          I only need
to concern myself, as far as [Michael] is concerned, with whether or not he is
agreeable to submit himself to the jurisdiction of the court for the purpose of
the Court’s asking him to provide documents and checkbooks and other matters
that he may have, if he has any, that relate in any way to the Doris Rose
Preston or Deartis Preston business.  That’s all I need to know.

Michael
testified that he understood that he was a defendant in the ancillary suit
filed by Deartis against him and Scherry but that he was only a witness in
Doris’s estate case.  He submitted to the jurisdiction of the trial court,
stated that Scherry’s attorney also represented him, and, to the extent that he
had not already done so, agreed to turn over documents in his possession that
were responsive to Benolken’s requests.  Michael confirmed that much of the
money that was transferred to him from the disputed First Bank account had been
spent on attorney’s fees and on the Sailfish house.

          Before
recessing the hearing, the trial court stated that it was concerned about the
“ongoing track that the case is on” due to the “continuing, almost incredibly
frustrating, maddening document situation that’s going on at this time.” 
According to the trial court, “because [Scherry] indicated she fails to
understand the scope of the discovery orders or the orders to compel or she
reaches her own conclusions about what she’s supposed to produce, . . .
the ad litems don’t have enough information and nobody can go forward.”

                   9.       April
23, 2007 Hearing—Show Cause

          At
the outset of the hearing, the trial court once again explained its frustration
with the case after mentioning that it disagreed with Scherry’s prior testimony
that she could not take any action in regard to Doris’s teacher retirement
account until the probate matter had closed,

And as I stated in my
rendition on Thursday, this is a particularly frustrating case to the Court
because much, much expense has been incurred, and much delay has . . .
occurred in this case.  Largely, it appears there[] still, today, even this
late in the case, remains a fundamental either recalcitrance and refusal or
complete lack of understanding as to the scope of the obligation of the
administratrix and/or applicants in the guardianship case to produce documents
and records, regardless of what the position is of the party or what the party
believes about the legal status of those documents and whether the party
believes something is relevant or not.  This is very frustrating for the Court
. . . .

 

          Benolken
testified in the narrative that estate funds were being improperly spent
without court approval, that “items that are normally handled through the
estate process [were] being handled in a totally different fashion out of other
accounts,” and that Doris’s estate funds were being “dissipated as the sole and
proximate result of [Scherry’s] continued refusal” to fully comply with the
trial court’s orders.  In addressing the Sailfish house documents, Benolken said
that it looked like Scherry had signed Deartis’s name—without any authority—on one
of two versions of the sales contract for the Sailfish house that were in
evidence.[10]  Benolken thoroughly reviewed
the various shortcomings of Scherry’s and Michael’s compliance with the trial
court’s orders,[11] explained how she
thought Scherry had violated her fiduciary duty as administratrix of Doris’s
estate,[12] and urged that Scherry
be removed as administratrix as a sanction.

          The
trial court made the following findings at the conclusion of the show cause hearing:

I concur with the
position of the attorney ad litem that [Scherry] has been given multiple
opportunities by this court to simply comply with document discovery.  She has
repeatedly made her own decisions about what she thinks is relevant.  She has
continually reiterated untenable positions regarding document production.  And
while she continues to insist that she’s given Ms. Benolken everything, sometimes
more than once, her performance of the document production has been highly
selective, extremely inadequate.

          . . . [T]he
Court determines from that evidence, [that Scherry] has not even cooperated
with her own counsel in connection with that matter and has made her own
decisions about what documents to make available to him, based on erroneous and
irrelevant consideration, such as whether or not it would, in her judgment,
increase expenses in the case to provide the documents to her counsel which
have been previously ordered.

          The Court
has been very, very patient.  The Court has executed more than one order.  The
Court has allowed a lot of time.  The Court has tried the method of placing the
administratrix in a noncourt record environment with the ad litem counsel
and her own counsel in an attempt to secure simple, straightforward document
production requests.

                   . . . .

          It’s clear
that the administratrix has no notion that she needs to secure court approval
for anything, despite repeated instructions by the Court and, actually, in open
court by ad litem counsel and others.  It is clear that she is not
informing her own counsel of actions that she’s taking.  The purchase of the
house was without court approval.  Whether it was deemed by her to be in the best
interest of the ward, Deartis Preston, or not, she is simply thumbing her nose
at the jurisdiction of the court.

 

                   . . . .

          [Scherry]
has withheld documents, made her own determinations about documents, [and]
offered very irrelevant and, in fact, almost insulting excuses, such as the
copy machine didn’t work correctly or some other avoidance technique . . . .

The
trial court then found Scherry in “constructive contempt” of court and gave her
an opportunity to “cure” this by producing the requested documents in their
original form.  The court suspended Scherry’s power of attorney and stated that
it “will have under advisement the possibility of the following sanctions: 
Removal of [Scherry] as . . . dependent administratrix . . .
and [the] striking of her pleadings.”

                    10.     May
7, 2007 Order on Show Cause

          On
May 7, 2007, the trial court signed its order on show cause, detailing the
findings set out orally at the April 23, 2007 hearing and numerous additional
findings and conclusions, including the following findings regarding Michael:

          11.   To
the extent there was a deficiency in any notice on any matters heard by the
Court, [Michael] waived notice by his appearance and participation without
objection and voluntarily subjected himself to the jurisdiction of the Court.

 

          12.   Despite
being placed on adequate notice of the contested nature of the accounts on
which [Michael’s] name appears in addition to [Doris’s], as well as this
Court’s previous order regarding preserving the status quo of such
account, [Michael] has testified that he has unilaterally expended large
portions of the $70,000 that was contained in such alleged survivorship
account, under his own belief and idea that it was his money . . . . 
[Michael] has failed to abide by this Court’s directives as to him.

 

The
trial court adjudged both Scherry and Michael in constructive contempt of court
and gave them the opportunity to “purge” their contempt by producing all of the
requested documents to Benolken by May 18, 2007.  The trial court also decreed the
following regarding sanctions:

[T]he Court hereby
takes under advisement imposing the harshest available sanctions, including but
not limited to[,] striking the pleadings of [Scherry] and/or [Michael] in cause
number PR-2005-00802, GS-2007-00162, and all ancillary proceedings that were or
could have been filed in connection therewith, including, but not limited to,
PR-2005-00802-01 and all other matters ancillary to the core proceeding, and
impos[ing] all other available death penalty sanctions . . . .

                   11.     May
7, 2007 Order on Status Conference

          On
May 7, 2007, the trial court signed an order on status conference decreeing,
among other things, “that [Michael] has submitted to the jurisdiction of this
Court and is a party to this and all related proceedings.”

                   12.     May
9, 2007 Order Granting Application for Temporary Injunction

          On
May 9, 2007, the trial court granted an injunction prohibiting Scherry and
Michael from using any of Deartis’s property, including the funds in the
disputed First Bank accounts.

                   13.     June 13, 2007
Hearing

          On
June 13, 2007, the trial court held the first of a number of hearings in which it
considered whether Scherry and Michael had successfully purged their
constructive contempt set out in the May 7, 2007 order on show cause.  Additional
documents were not turned over until June 4, 2007—after the May 18, 2007
deadline—but the trial court excused the tardiness and limited its inquiry to
whether Scherry and Michael had complied with the May 7, 2007 order on show
cause by producing all of the requested documents.[13]

          Scherry
testified that she had received a copy of the show cause order, that she had
read the order, and that she had received a copy of the transcript of the April
23, 2007 hearing.  Nonetheless, she testified that she had not produced
documents relating to Doris’s car, which the estate owned and which Scherry had
paid off without obtaining the trial court’s permission to do so; that she had allowed
Eva to drive Doris’s car without paying for its use even though Deartis paid
for its insurance; that she had used money from Deartis’s representative payee
account to pay taxes on the Austin Street house; that she had used estate money
to pay filing fees in Deartis’s guardianship case; that she had deposited a
royalty check into an account that she held with Doris and that was also in
Doris’s name when she died; that she had used money from Deartis’s
representative payee account to pay taxes on land owned by the family in Cherokee
County; that she had produced certain banking records regarding Doris’s bank accounts
but had not requested the rest of the records from the banks; that she had
never deposited a royalty payment for Doris into the estate account; that she had
never produced any of Doris’s bills from Atmos Energy or Sears; that she had accepted
a check from Michael’s disputed First Bank account in the amount of $11,000 as
payment for her services as administratrix; that she had not listed Doris’s
royalty interest in the inventory and appraisement that she filed; and that she
had deposited Doris’s tax refund in Deartis’s representative payee account
instead of Doris’s estate account.  Scherry admitted that there were more
documents relating to Doris’s estate that she had not produced.  The trial
court recessed the hearing.

                    14.     June
14, 2007 Hearing

          The
trial court held a hearing on June 14, 2007, primarily to address scheduling
matters.  At the conclusion of the hearing, it sua sponte removed Scherry as
administratrix of Doris’s estate and appointed Dubner successor dependent
administrator.  The trial court reasoned,

          It is
apparent to me that [Scherry], although repetitively admonished, held in
contempt, placed in an opportunity to purge the contempt, still does not take
seriously or understand or -- either that or refuses to accept, I don’t
know which, the obligations of a court-appointed fiduciary.

                   . . . .

          I
cannot in good conscience -- in fact, it would be, I think, bordering on
neglect to do so, to leave [Scherry] in the position of court-appointed
administratrix, given the uncontroverted evidence before the Court at this
time, which is the method by which the house and the parties live in was
acquired, the title that it’s held in, the complete lack of understanding, as
demonstrated by the closing, the action to have a local attorney provide a
power of attorney and have Deartis Preston execute documents, when it was clear
and should have -- either was known or should have been known to all
parties that he’s an incapacitated person and should never have been put in that
position.

 

          The failure
to account for funds, the commingling of funds, and the use of funds for the
multiple benefit of other parties is all uncontroverted before the Court.  The
failure to account for income, such as oil and gas royalty, the failure to
produce or place money in the registry of the court until ordered to do so or
until extreme actions were taken, all dictate to this Court that the level of --
lack of performance, the level of violation, the level of disregard or
misunderstanding -- it doesn’t really matter which, because it has the
same effect -- expressed or -- I’m sorry not expressed --
demonstrated by [Scherry], necessitates her immediate removal.

                    15.     Dubner’s
Original Petition in Intervention

          Dubner,
as successor dependent administrator of Doris’s estate, filed an original
petition on July 20, 2007, intervening in the lawsuit filed by Deartis against
Scherry and Michael.  He alleged a claim for breach of fiduciary duty against
Scherry only and claims for conversion and for recovery of the funds in the
disputed First Bank accounts pursuant to probate code section 442 against both
Scherry and Michael.  Dubner later sued Western Surety, the surety on the bond
filed by Scherry, alleging that it was liable for the wrongful conduct of Scherry.[14]

                   16.     July
30, 2007 Hearing

          On
July 30, 2007, the trial court continued the hearing regarding whether Scherry
and Michael had purged their constructive contempt.  Scherry testified that she
had not produced Doris’s tax returns, all of Doris’s banking records and
statements, an Atlanta Life policy, various invoices from creditors (such as
Sears and Foley’s), and the signature cards for Doris’s undisputed bank
accounts.  Scherry testified that she had canceled the insurance on the Austin
Street house; that she had used estate funds to purchase a replacement
refrigerator for the Austin Street house; and that she had never collected rent
from her son, who was living at the Austin Street house when Doris died.[15]
 Scherry also admitted that even though she had testified in the past that the
certificates of deposit left by Doris were to be used for Deartis’s benefit,
she had designated her children beneficiaries of a certificate of deposit that
was created using funds from a certificate of deposit account that Doris owned
when she died and that was left in Scherry’s or Michael’s name.  The trial
court recessed the hearing.

                   17.     July
31, 2007 Hearing

          At
the July 31, 2007 hearing, Scherry testified that Doris had received royalty
payments after Doris died and that the payments were deposited into a “house”
account in Scherry’s and Doris’s name but that Scherry had never repaid the
royalty payments back to the estate.  Scherry stated that the 2006 taxes on the
Austin Street house had not been paid even though she could have paid them in
her capacity as administratrix.  She also admitted that she had received
payments from Michael from one of the disputed First Bank accounts after February
23, 2007, (the date the trial court signed the order on Deartis’s motion to
compel) and that there were still documents in her possession pertaining to
Doris’s estate that she had not produced.  The trial court recessed the
hearing.

                   18.     August
1, 2007 Hearing

          At
an August 1, 2007 hearing, attorneys questioned Scherry more about the Sailfish
house, bank accounts, and her failure to produce documents.  She gave the
following explanation for her failure to timely produce documents relevant to
Benolken’s requests:

          More than
one time I’ve been asked for different things, but let me start at the very
front.  As I’ve said before, I was not actually aware of some of the things
that I have that I should have sent.  I did not think that she would need an
accident policy.  Doris did not die of an accident, and there was no money to
be collected on that policy.  She didn’t have any life policies other than the
one, and I’m not sure that I sent it or I didn’t.

 

                   . . . .

          She had
different banks, and she had the insurances.  She had the CDs and she had all
of this stuff that has to be arranged to keep up with.  So I tried to make sure
that those things were made available because I knew they were important, you
know, the things -- the bank situations.  I don’t know how I forgot the
Hibernia account.  Perhaps we were not really using that account, and she had
so many up here that -- that it just did not cross my mind to send it.

 

          I had no
reason to hide it.  I just didn’t think to send it.  We weren’t spending
anything out of it. . . .

 

          Then when
they [presumably Deartis, Gwendolyn, and Eva] moved down there, I had three
houses to be -- contend with.  I had many reports to be sent in.  I --
sometimes the timing was not long enough. . . .

          I did not
really understand accounting, and I was trying to get myself organized so that
when we sent it -- because I did not realize it was long past due. . . .

The
trial court recessed the hearing.

                   19.     September
18, 2007 Hearing

          At a
hearing on September 18, 2007, Scherry testified that she had received checks
from Michael that were drawn on a disputed First Bank account even though she
knew the trial court had ordered that no more funds were to be expended from
the disputed accounts.  And as in a previous hearing, Scherry agreed that when
she renewed the disputed certificate of deposit account that Doris had
allegedly entrusted to her, she did not designate Deartis as its beneficiary.

          Michael
testified that he had been “integrally” involved in the litigation since it
began; that he understood that the order on show cause required him to produce
documents; that he wrote checks using funds from a disputed First Bank account
after the trial court ordered him and Scherry to preserve the status quo as to
“all assets”; and that he had agreed at an earlier hearing that he was making
an appearance before the trial court in all matters and submitting to the trial
court’s jurisdiction.  Michael further testified that he thought compliance
with the order on show cause was voluntary, that the funds spent from the
disputed First Bank account were used for family, and that the Sailfish house
was purchased because Deartis, Gwendolyn, and Eva needed a home.  The trial
court recessed the hearing.

                   20.     Deartis’s
Motion for Sanctions

          On
October 19, 2007, Deartis filed a motion for sanctions against Scherry and
Michael in the PR-2005-00802-01 cause (Deartis’s suit against Scherry and
Michael).  The motion stated that it was “filed out of an abundance of
caution[] and not in lieu of any other relief requested in this case. . . . 
Ad Litems request the Court to take affirmative action and implement the
proposed sanctions which this Court previously has taken under advisement in
this case.”  Deartis outlined Scherry’s and Michael’s alleged sanctionable
conduct—the refusal to provide discovery, to render an accounting, and to obey
the trial court’s orders—and requested, among other things, that the trial
court enter death penalty sanctions against Scherry and Michael, including, but
not limited to, striking their pleadings in the PR-2005-00802-01 cause and
entering a default judgment against them.  Dubner adopted the position asserted
by Benolken in Deartis’s motion for sanctions.

                   21.     October
26, 2007 Hearing and December 3, 2007 Closing Arguments

          On
October 26, 2007, the trial court convened the final evidentiary hearing regarding
whether Scherry and Michael had successfully purged their constructive
contempt.  The trial court granted Benolken a “trial amendment” to clarify that
Deartis’s motion for sanctions applied retroactively,[16]
and Michael confirmed that the order on show cause applied to him.  The parties
rested and closed at the conclusion of the hearing, and the trial court heard
closing arguments at a hearing on December 3, 2007.

          D.      2008
Pleadings and Proceedings

                   1.       Consolidated
Order on Motions to Compel and For Sanctions and Show Cause

          On
March 4, 2008, the trial court signed a consolidated order on motions to compel
and for sanctions and show cause, granting Deartis’s motion to compel and
Deartis’s and Dubner’s motions for sanctions, holding Scherry and Michael in constructive
contempt of court for failing to comply with numerous orders, setting out in
detail Scherry’s and Michael’s acts and omissions underlying the order, and
imposing death penalty sanctions against both of them.  The order stated in part,

[T]he Court hereby
strikes all of the pleadings of [Scherry] and [Michael] in cause number
PR-2005-00802, GS-2007-00162, and all ancillary proceedings that were or could
have been filed in connection therewith, including, but not limited to,
PR-2005-00802-01 and all other matters ancillary to the core proceeding, and
imposes all other available death penalty sanctions, including, but not limited
to, precluding [Scherry] and/or [Michael] (i) from acting as Dependent
Administrator/rix, (ii) from being appointed as Guardian of the Person
and/or the Estate of Deartis Preston, (iii) from acting as agent-in-fact
for Deartis Preston, (iv) from pursuing claims that have been brought or
could have been brought in any of the Related Cases and/or any further
ancillary matters thereto, (v) from defending claims that have been brought or
could have been brought in the Related Cases and/or any further ancillary
matter thereto, (vi) from offering or eliciting any evidence or defenses
relating to the causes of action that were or could have been asserted against
him or her by Attorney Ad Litem or Guardian Ad Litem or Successor
Dependent Administrator in any of the Related Cases and/or any further
ancillary matters thereto; (vii) from opposing or interposing any
objections concerning any and all evidence of damages against them, (viii) from
being entitled to obtain responses to any pending discovery requests from
Deartis Preston, Ad Litems and/or Successor Dependent Administrator, and
(ix) hereby awarding judgment by default on liability in favor of Deartis
Preston and the Estate of Doris Rose Preston as against [Scherry] and [Michael]
. . . .

                   2.       Post-Death
Penalty Sanctions Hearings

          The
trial court convened hearings on June 19, 2008; August 21, 2008; and August 22,
2008, on Benolken’s, Miller’s, and Dubner’s then-pending applications for attorneys’
fees.  After ruling on the applications, the trial court convened hearings on
August 22, 2008; September 12, 2008; and December 11, 2008, to allow Benolken
and Dubner to prove up damages, including exemplary damages, in their suits on
behalf of Deartis and the estate against Scherry and Michael (cause
PR-2005-00802-01).

                   3.       Order
of Severance

          On
December 11, 2008, the trial court signed an order severing the default
judgment and all claims and issues of Deartis against Scherry and Michael from
cause PR-2005-00802-01.  The trial court assigned cause PR-2005-00802-02 to
Deartis’s case.

          E.      2009
Proceedings

                   1.       Amended
Final Default Judgment—PR-2005-00802-02

          On
January 8, 2009, the trial court signed an amended final default judgment in
favor of Deartis against Scherry and Michael.[17]  The order (1) awarded
the Sailfish house to Deartis free and clear of any and all liens, claims, and
encumbrances (except for claims of “governmental taxing authorities” and an
equitable lien granted by the separate judgment in favor of Doris’s estate);
(2) enjoined any and all persons and entities from “[u]ndertaking any
actions which would endanger the Sailfish [h]ouse in any way”; (3) declared
the Sailfish house Deartis’s sole and separate property; (4) awarded
Deartis “actual damages” in the amount of $127,000; (5) awarded Deartis
exemplary damages in the amount of $414,000; and (6) awarded Deartis
prejudgment and postjudgment interest.  The trial court signed its findings of
fact and conclusions of law on January 28, 2009.

                   2.       Final
Judgment—PR-2005-00802-01

          On
April 13, 2009, the trial court signed a final judgment in favor of Dubner, as
successor administrator of Doris’s estate, and Western Surety against Scherry
and Michael.[18]  Regarding Dubner’s claims
against Scherry under probate code section 442, the trial court awarded Doris’s
estate $13,023.70.[19]  On Dubner’s claims
against both Michael and Scherry under probate code section 442, the trial
court awarded Doris’s estate $83,635.10.[20]  The trial court
additionally awarded Doris’s estate exemplary damages in the amount of
$180,716.94; an equitable lien on the Sailfish house in the amount of
$25,070.34 “to secure payment of the funds from account referenced above ending
in 612”; and “attorney’s fees and expenses” against Scherry in the amounts of
(1) $29,125.45 “for attorney’s fees and expenses of [Dubner] that would
not have otherwise been incurred except for the actions and/or inactions of”
Scherry, (2) $53,186.62 “for fees and expenses incurred by [Miller] that
would not have otherwise been incurred except for the actions and/or inactions
of” Scherry, and (3) $174,067.00 “for fees and expenses incurred by
[Benolken] that would not have otherwise been incurred except for the actions
and/or inactions of” Scherry.  Of the judgment awarded to Doris’s estate
against Michael, $85,000 was assigned to Western Surety.  On May 11, 2009, the
trial court signed an order that assigned the portion of the final judgment in favor
of Doris’s estate to Deartis.

          The
judgment awarded Western Surety $85,000 on its indemnity claim against Scherry
plus attorneys’ fees and expenses in the amount of $38,408.63.[21]
 The trial court adopted Dubner’s and Western Surety’s joint proposed findings
of fact and conclusions of law.

                   3.       Account
for Final Settlement

          On
October 22, 2009, the trial court signed an order approving the account for
final settlement filed by Dubner, ordering that no property remains in Doris’s
estate, discharging Dubner of his duties, and closing the estate.  The account
provided in part that “[t]he total value of the estate at the beginning of this
accounting period [June 26, 2008, to June 12, 2009] was $128,029.26” but that
after considering total receipts, total cash disbursements and expenses paid
(which included attorneys’ fees), and total non-cash disbursements, the total
value of the estate on hand was $0.00.

          F.       Attorneys’
Fees

          The
trial court conducted hearings on Benolken’s, Miller’s, and Dubner’s
applications for attorneys’ fees throughout the litigation.  The trial court
awarded Benolken $11,200 in attorneys’ fees and costs on March 14, 2007, and
$104,780.19 in attorneys’ fees pursuant to the order approving the account for
final settlement.  The trial court awarded Miller and Dubner attorneys’ fees in
the amounts of $25,237.06 and $22,971.85, respectively, pursuant to the order
approving the account for final settlement.  Scherry and Michael appeal.

III.  Sanctions

          In
their first issues in both cause 02-09-00095-CV and cause 02-09-00233-CV,
Scherry and Michael argue that the trial court abused its discretion and
committed reversible error by imposing death penalty sanctions.  They contend
that there was no direct nexus between the offensive conduct and the sanctions
imposed, that the sanctions were excessive, and that the sanctions violated
their due process and due course of law guarantees.

          A.      Standard
of Review and Applicable Law

          Trial
courts have broad discretion to impose discovery sanctions to secure compliance
with discovery rules, to deter other litigants from similar misconduct, and to
punish violators.  See Chrysler Corp. v. Blackmon, 841 S.W.2d
844, 849 (Tex. 1992).  We therefore review a trial court’s imposition of
discovery sanctions for an abuse of discretion.  Cire v. Cummings, 134
S.W.3d 835, 838 (Tex. 2004).  A trial court abuses its discretion if it acts in
an arbitrary or unreasonable manner, or if it acts without reference to any
guiding rules or principles.  Downer v. Aquamarine Operators, Inc., 701
S.W.2d 238, 241B42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986)).  In reviewing sanctions orders, we are not
bound by a trial court’s findings of fact and conclusions of law; rather, we
must independently review the entire record to determine whether the trial
court abused its discretion.  Am. Flood Research, Inc. v. Jones, 192
S.W.3d 581, 583 (Tex. 2006).

          Texas
rule of civil procedure 215.2(b) allows a trial court to sanction a party for
failure to comply with a discovery order or request.  Tex. R. Civ. P. 215.2(b). 
Sanctions that a trial court may impose include an order refusing to allow the
disobedient party to support or oppose designated claims or defenses and an
order striking out pleadings or rendering a judgment by default against the
disobedient party.  Tex. R. Civ. P. 215.2(b)(4), (5).  When a motion for
sanctions asserts that a respondent to a discovery request has failed to
produce a document within its possession, custody, or control, the movant has
the burden to prove the assertion.  GTE Commc’ns Sys. Corp. v. Tanner,
856 S.W.2d 725, 729 (Tex. 1993).

          In
discovery-sanction cases, a trial court’s discretion is limited by the
requirement of rule of civil procedure 215.2(b) that the sanctions be “just”
and by the parties’ constitutional right to due process.  TransAmerican Natural
Gas Corp. v. Powell, 811 S.W.2d 913, 917–19 (Tex. 1991).  A sanction is
just if a direct relationship exists between the offensive conduct and the
sanctions imposed.  Id. at 917; see Chrysler Corp., 841 S.W.2d at
849.  A direct nexus exists when the sanction is directed against the true
offender and is tailored to remedy any prejudice the discovery abuse caused.  TransAmerican,
811 S.W.2d at 917.  To be just, a sanction must also not be excessive.  Id. 
A sanction imposed for discovery abuse should be no more severe than necessary
to satisfy its legitimate purposes.  Cire, 134 S.W.3d at 839.  Striking
a party’s pleadings for discovery abuse is “the most devastating” sanction a
trial court may impose and may only be imposed in “exceptional cases” where
they are “clearly justified.”  GTE, 856 S.W.2d at 729–30; TransAmerican,
811 S.W.2d at 917–18.  In Cire, the supreme court clarified that

striking pleadings is
a harsh sanction that must be used as a last resort after the trial court has
considered lesser sanctions, and that in all but the most egregious and
exceptional cases, the trial court must test lesser sanctions before resorting
to death penalty sanctions.  However, in cases of exceptional misconduct . . . ,
the trial court is not required to test lesser sanctions before striking
pleadings under our previous holdings in TransAmerican, Chrysler,
and GTE, so long as the record reflects that the trial court considered
lesser sanctions before striking pleadings and the party’s conduct justifies
the presumption that its claims lack merit.  This means that a trial court must
analyze the available sanctions and offer a reasoned explanation as to the
appropriateness of the sanction imposed.

134
S.W.3d at 842.

          B.      Direct
Nexus

The record demonstrates that there is a direct nexus
between the offensive conduct, the offenders, and the sanctions imposed.  The
offensive conduct was the repeated and admitted failures by Scherry and Michael
to comply with the trial court’s orders requiring them to produce documents
responsive to Benolken’s discovery requests and to “preserve the status quo as
to all assets” that were part of Doris’s estate and that were the subject of
the ancillary lawsuit filed by Deartis against Scherry and Michael.  The
offensive conduct was attributable to Scherry’s and Michael’s actions and
inactions regarding their failures to comply with the trial court’s orders, not
the actions or inactions of their attorney or some third party.[22] 
It is undisputed that the trial court imposed the case-determinative sanctions
because of Scherry’s and Michael’s conduct, which was examined at length over
numerous hearings.

Scherry and Michael argue that there was no direct
nexus between the offensive conduct and the sanctions imposed because the March
14, 2007 “Sanctions Order” was based upon conduct that allegedly occurred prior
to the filing of Deartis’s suit on January 19, 2007, and that was part of a
different case.  But the order that the trial court signed on March 14, 2007,
was the second order granting Deartis’s motion to compel; the trial court did
not enter an order sanctioning Scherry and Michael until March 4, 2008, one
year later.  Moreover, Benolken, Miller, Dubner, and counsel for Scherry
and Michael stipulated that “all prior testimony
and documentary evidence obtained and admitted in all prior hearings . . .
are admitted conclusively as evidence to be considered and used for all
purposes with regard to all matters.”

Michael argues that there was no direct nexus between the offensive
conduct and the sanctions imposed because he “was not a party to the action
other than as a P.O.D. beneficiary of the multi-party accounts brought back
into the estate of Doris Preston” and because he was not served.  However, in
the May 7, 2007 order on show cause, the trial court found that, “[t]o the
extent there was a deficiency in any notice on any matters heard by the Court,
[Michael] waived notice by his appearance and participation without objection
and voluntarily subjected himself to the jurisdiction of the Court.”  The
record supports this finding.

Accordingly, we overrule the
part of Scherry’s and Michael’s first issues challenging the propriety of the
sanctions order under the first prong of the TransAmerican test.

          C.      Excessiveness

          Turning
to Scherry’s and Michael’s arguments that the sanctions were excessive, under
the standards articulated above, we must (1) decide whether death penalty
sanctions were warranted and (2) determine whether the record reflects
that the trial court (a) considered lesser sanctions before striking
Scherry’s and Michael’s pleadings and (b) actually tested the lesser
sanctions before striking the pleadings unless this is a case involving
“exceptional misconduct.”  See Cire, 134 S.W.3d at 842.

          The
factual and procedural background above sets out in painstaking detail the
years of litigation that dragged on due in large part to Scherry’s and
Michael’s refusal to comply with the trial court’s orders.  As early as January
2007, the trial court expressly recognized that Scherry and Michael had chosen
to handle Doris’s probate matters through their own informal, intra-family
procedures.  Scherry’s and Michael’s attorney even acknowledged that Scherry
had “different ideas about the need for a structured arrangement”; in Scherry’s
opinion, the “informal family arrangements” were to “be unfettered by the . . .
unnecessary intrusions of the law.”  But the trial court exclaimed that it had a
duty to require that the administration of Doris’s estate be conducted in
accordance with the law—although that meant spending time and estate money
litigating the case, which included permitting the ad litems to fulfill
their duties in representing Deartis’s interests.  As the trial court
identified, without Scherry’s and Michael’s compliance with its orders, the ad litems
“don’t have enough information and nobody can go forward.”

          But
after the trial court signed two orders granting motions to compel and conducted
several hearings, it made the following findings in the May 7, 2007 order on
show cause relevant to its various attempts to obtain compliance with its
orders:

·     
“The
Court has been very, very patient.”

·      “The Court has
attempted to forebear on the imposition of sanctions[,] which this Court
considers a progression of lesser sanctions . . . .”

 

·     
“The
Court has executed more than one order.”

·     
“The
Court has allowed a great deal of time for compliance.”

·      “The Court has even
tried the method of placing [Scherry] in a non-court-record environment . . .
in an attempt to secure her proper responses to simple, straightforward
document production requests.”

 

·      “The Court has
attempted to make orders that would maintain the status quo . . . .”

 

·      “The Court has not
imposed sanctions on [Scherry] in the past in an effort to recognize the
possibility that there might have been a misunderstanding on the part of
[Scherry] with respect to her court-imposed obligations . . . .”

 

·      “The Court has
exercised every leniency toward [Scherry] to allow her every possible latitude.”

 

Notwithstanding
all of this, based on Scherry’s failure and refusal to abide by the trial
court’s orders, it concluded that she

·       
“will
not modify her behavior”;

·       
“will
not comply”;

·       
“will
not produce documents”;

·       
“will
continue to impose her own decisions and judgment on the relevancy and
materiality of documents”;

 

·       
“will
continue to withhold documents and offer irrelevant excuses and reasons for
failure to tender documents”; and

 

·       
“will
continue to take positions which are not defensible.”

          After
making these findings and conclusions, instead of imposing sanctions, the trial
court gave Scherry and Michael yet another opportunity to “purge” their
constructive contempt.  But Scherry and Michael ultimately failed to do so, as
the hearings on June 13, 2007; July 30, 2007; July 31, 2007; August 1, 2007;
September 18, 2007; and October 26, 2007, reflect.[23] 
Among other things, Scherry admitted that there were more documents relating to
Doris’s estate that she had not produced, and Michael admitted that he had
written checks using funds from a disputed First Bank account after the trial
court had ordered him and Scherry to preserve the status quo as to “all
assets.”  In the March 4, 2008 order on motion to compel and for sanctions and
show cause, the trial court consequently made the following findings regarding
Scherry:

1.       Instead of
complying with the Court’s orders and heeding this Court’s repeated warnings,
Scherry Levi engaged in an unremorseful pattern and practice of her own
choosing, with only a patchy and self-determined production of relevant
documents in the face of clear and unambiguous instructions to the contrary
from this Court.  The Court finds that Scherry Levi has possession, custody,
and control of documents which are clearly responsive to [Ad Litems’] discovery
requests and this Court’s orders compelling production which she has not
produced.

 

2.       The Court
finds that [Scherry] wholly failed to produce either a fiduciary accounting or
the associated records, both of which were required by previous orders. . . .

 

          . . . .

 

5.       The Court
finds that [Scherry] did not provide any valid or justifiable excuse or reason
for the absence of the documents, the records[,] and the accounting, and that
she did not show any cause whatsoever as to why this Court should not impose
the sanctions against her . . . .

 

          . . . .

 

7.       Despite
being placed on adequate notice of the contested nature of the accounts on
which [Michael’s] name appears in addition to [Doris’s], as well as this
Court’s previous order regarding preserving the status quo of such
account, [Scherry] conspired and participated in [Michael’s] dissipation of
large portions of the $70,000 that was contained in such alleged survivorship
account. . . .

 

          . . . .

 

12.     The Court
finds that despite clear direction from this Court . . . that
[Scherry] could not commingle funds and assets . . . belonging to
[Deartis] and/or the Estate . . . , she continued obstinately to
handle Deartis’s property and Estate property in her own way. . . .

 

13.     [Scherry], in
her capacity as Dependent Administratrix, breached her fiduciary duties and
trust that she owed to the Estate in numerous respects . . . .

 

          . . . .

 

15.     [Scherry]
breached her fiduciary duties and trust that she owed to [Deartis] in numerous
respects . . . .

 

          The trial court made the following
findings regarding Michael:

 

20.     [Michael] was
placed on adequate notice that the joint account he held with [Doris], which he
alleged had a valid right of survivorship designation, was claimed to be the
property of [Deartis] and/or the Estate.  Despite being placed on adequate
notice of the contested nature of the accounts on which [Michael’s] name
appears in addition to [Doris’s], as well as this Court’s previous order
regarding preserving the status quo of such account, [Michael] has
testified that he has unilaterally expended large portions of the $70,000 that
was contained in such alleged survivorship account, under his own belief and
idea that it was his money . . . .

 

                   . . . .

 

22.     The evidence
further showed that [Michael] not only joined in with [Scherry’s] actions in
this matter, including her actions with respect to her refusal to comply with
this Court’s discovery orders and the Ad Litems’ discovery requests, but
also intentionally and actively directed [Scherry] to act as she did, including,
but not limited to, her actions with respect to her refusal to comply with this
Court’s discovery orders and the Ad Litems’ discovery requests.

 

                   . . . .

 

24.     The Court
finds that [Michael] was in possession of documents relevant to this case, and
which he specifically was ordered to produce, and was able to produce but
refused to do so. . . .

 

          The trial court made the following
“General Findings”:

 

44.     It is an
accurate statement that the Court “has bent over backwards” over the course of
many months to provide [Scherry] and [Michael] every chance to comply with
their duties and obligations to [Deartis], this Court, and the parties in each
of these Related Cases, including, but not limited to, extending deadlines,
excusing nonperformance between May 7, 2007 and June 4, 2007, offering conferences
to explain duties, holding lengthy hearings, answering questions posed by
[Scherry] from the witness stand, explaining their duties in open court, and
entering orders which allowed for the opportunity to purge contempt and their
repeated failure and refusal to comply with valid Court orders and Ad Litems’
discovery requests, all to no avail. . . .  The Court has
extended every forbearance, every delay, every second chance that is possible
in these Related Cases in its attempt to avoid the very result that now has
occurred in these cases, i.e., extremely high costs, including court-appointed
fiduciaries’ and attorneys’ fees and expenses, in complex and growing
litigation because of the inactions and actions of [Scherry] and [Michael].

 

                   . . . .

 

47.     Throughout
these proceedings in each of the Related Cases, [Scherry] and [Michael] have
flaunted their disrespect for this Court and the system it is obliged to orchestrate
and implement.  Their own testimony shows that [Scherry] and [Michael] operated
on their own alternate system. . . .

 

                   . . . .

 

55.     Although the
remedy contemplated herein associated with a failure to comply might be harsh,
the Court finds and concludes that the enforcement of [Scherry’s] and [Michael’s]
duties and obligations in the circumstances present here are of paramount
importance.  The Court is recalcitrant, reluctant, and unwilling to dispose of
a case on procedural grounds and, therefore, favors progressive sanctions.  The
Court has been reluctant to assess what are referred to as “death penalty”
sanctions, but because of the conduct of the parties, the evidence presented,
and the reasons detailed in this order, will now implement said sanctions.

 

                   . . . .

 

60.     Based upon
[Scherry’s] and [Michael’s] persistent and
obstructive behavior in this case, including, but not limited to, their
repeated failure and refusal to engage in good faith discovery and obey lawful
Court orders compelling discovery, there now has arisen the presumption that
they have engaged [in] such a pernicious course of conduct because their claims
and defenses have no merit.

 

                   . . . .

 

·       
62.     The
Court finds there are no lesser sanctions which could be implemented to gain [Scherry’s]
and [Michael’s] cooperation and compliance in this case.  The
Court is mindful of Ad Litems’ strenuous argument that monetary sanctions
likely may constitute an empty remedy against either or both [Scherry]
and [Michael] because it is doubtful they are collectible.  The
Court finds that there is no reasonable alternative to the granting of the most
severe death penalty sanctions in each of the Related Cases as to both [Scherry]
and [Michael].  [Emphasis added.]

 

          The
record thus shows that the trial court afforded Scherry and Michael numerous
opportunities to comply with its orders, but they proceeded to administer
Doris’s estate using their own informal procedures and admitted that they had
failed to comply with the trial court’s orders, even after being given numerous
opportunities to comply.  On the totality of this record, we conclude that
death penalty sanctions were warranted in this exceptional case.

          The
March 4, 2008 consolidated order on motions to compel and for sanctions and
show cause contains a lengthy, reasoned explanation as to why death penalty
sanctions were appropriate.  The order also clearly shows that the trial court
considered, but ultimately rejected, lesser monetary sanctions.  The trial
court indicated that it was “reluctant” to assess death penalty sanctions but,
nonetheless, concluded that there was “no reasonable alternative to the granting
of the most severe death penalty sanctions” because of the likelihood that the
lesser monetary sanctions would be an “empty remedy.”  The March 4, 2008 order further
shows that the trial court reasonably found that Scherry’s and Michael’s
persistent and obstructive behavior justified the presumption that their defenses
to Deartis’s and Dubner’s claims lacked merit.  “Ordinarily, a trial court
would also be required to test the effectiveness of lesser sanctions by
actually implementing and ordering each sanction that would be appropriate to
promote compliance with the trial court’s orders in this case.”  Cire,
134 S.W.3d at 842.  But because of Scherry’s and Michael’s blatant disregard for
the discovery process in this exceptional case involving protracted misconduct,
death penalty sanctions were clearly justified, and the trial court was not
required to first test lesser sanctions before imposing case determinative
sanctions.[24]  See id.

          Scherry’s
and Michael’s arguments that their constitutional rights were violated because
the trial court’s orders lacked specificity and because Michael was not a party
to the estate action are unpersuasive.  The May 7, 2007 order on show cause set
out in detail, again, the discovery that Scherry and Michael were ordered to
produce, and Michael submitted to the jurisdiction of the trial court on
several occasions throughout the record.  Scherry and Michael do not argue that
they did not understand the trial court’s orders; Scherry testified that she
“just didn’t think to send” responsive documents.

          Accordingly,
we conclude and hold that the trial court did not abuse its discretion by
imposing death penalty sanctions, and we overrule the remainder of Scherry’s
and Michael’s first issues, including their arguments challenging the sanctions
order under the second prong of the TransAmerican test.[25]

IV.  Disputed First Bank Accounts

          Scherry
and Michael assert arguments relevant to the disputed First Bank accounts in
their second, seventh, and eighth issues in cause 02-09-00095-CV and their
second, sixth, and seventh issues in cause 02-09-00233-CV.

          A.      Second
Issue—Cause 02-09-00095-CV

          Citing
Chandler v. Welborn, 156 Tex. 312, 294 S.W.2d 801 (1956), Scherry and
Michael argue that “any and all causes of action founded upon the survivorship
accounts . . . belonged to the estate of [Doris] and not [Deartis]”
because “[t]he Texas Supreme Court has held that an heir does not have [a] right
to bring a suit during the pendency probate of the estate except for the
benefit of the estate.”  Indeed, the executor or administrator of a decedent’s
estate generally has the exclusive right to bring suit for the recovery of real
and personal property belonging to the estate.  See Tex. Prob. Code Ann.
§ 233A (West 2003); Frazier v. Wynn, 472 S.W.2d 750, 752 (Tex.
1971) (“It is settled in Texas that the personal representative of the estate
of a decedent is ordinarily the only person entitled to sue for the recovery of
property belonging to the estate.”); Chandler, 156 Tex. at 318, 294
S.W.2d at 806 (“When administration is pending, the heirs are generally not
entitled to maintain a suit for the recovery of property belonging to the
estate . . . .”).  However, the supreme court in Chandler
also recognized an exception to the general rule when “it appears that the
administrator will not or cannot act, or that his interest is antagonistic to
that of the heirs desiring to sue.”  156 Tex. at 318, 294 S.W.2d at 806.  Under
this exception, an heir may maintain a suit to recover property belonging to
the estate while the administration is pending.  See id.; In re
Guardianship of Archer, 203 S.W.3d 16, 22 (Tex. App.—San Antonio 2006, pet.
denied).

          Assuming
that Scherry and Michael may even assert this argument,[26]
on this record, Deartis had standing to sue to recover property belonging to
Doris’s estate because Scherry’s interest in the disputed First Bank accounts
was indisputably antagonistic to Deartis’s interest.  See Chandler, 156
Tex. at 318, 294 S.W.2d at 806.  To the extent Deartis sued Scherry and Michael
to recover the funds from the disputed First Bank accounts under the theory
that the funds belonged to him, Chandler is inapposite.  Accordingly, we
overrule Scherry’s and Michael’s second issue in cause 02-09-00095-CV.

          B.      Second
Issue—Cause 02-09-00233-CV

          Scherry
and Michael argue that section 442 of the probate code “limits the liability of
any payee to an amount not greater ‘than the amount that the party, P.O.D.
payee, or beneficiary received from the multiple-party account’”; that “as a
matter of law there could not have been a breach of fiduciary duty, fraud,
conversion, or any other cause of action against Appellants by Appellee related
to the accounts”; and that “[a]ny potential liability was limited to the amount
of the accounts for the benefit of the estate of Doris Preston.”

          Probate
code section 442 authorizes the use of multi-party account funds to pay debts,
taxes, and expense of administration under certain circumstances.  Tex. Prob.
Code Ann. § 442 (West Supp. 2010).  Neither Scherry nor Michael argue that
the disputed First Bank accounts were not needed to pay for the significant
expenses of administration.  Further, the damages expressly awarded to the
estate pursuant to the section 442 claims are consistent with the amounts that
First Bank turned over to Scherry and Michael after Doris’s death.  At the
March 13, 2006 prove-up hearing, Scherry disclosed for the first time that Doris
had entrusted two certificate of deposit accounts to Scherry and Michael—one
worth approximately $79,000 and another worth approximately $49,000.  The trial
court found in favor of Dubner on his section 442 claims against Michael and
Scherry in the amount of $78,368.14 and against Scherry in the amount of
$49,206.40.  Scherry and Michael did not preserve for appellate review their
argument challenging the award of prejudgment interest, nor do they direct us
to any relevant authority.  See Allright, Inc. v. Pearson, 735 S.W.2d
240, 240 (Tex. 1987) (holding that error regarding award of prejudgment
interest must be preserved); see also Tex. R. App. P. 38.1(i).  We
overrule Scherry’s and Michael’s second issue in cause 02-09-00233-CV.

          C.      Seventh
and Eighth Issues—Cause 02-09-00095-CV and Sixth and Seventh Issues—Cause 02-09-00233-CV

          In
their seventh and eighth issues in cause 02-09-00095-CV[27]
and sixth and seventh issues in cause 02-09-00233-CV,[28]
Scherry and Michael argue that the funds in the disputed First Bank accounts
belonged to them.  It is well established that once a default judgment is taken
on an unliquidated claim, all allegations of fact set forth in the petition are
deemed admitted, except the amount of damages.  Holt Atherton Indus., Inc.
v. Heine, 835 S.W.2d 80, 83 (Tex. 1992); Stoner v. Thompson, 578
S.W.2d 679, 684 (Tex. 1979).  “[I]f the facts set out in the petition allege a
cause of action, a default judgment conclusively establishes the defendant’s
liability.”  Morgan v. Compugraphic Corp., 675 S.W.2d 729, 731 (Tex.
1984).

          Deartis
alleged the following in his third amended petition:

          Doris Rose
Preston (“Decedent”) died on August 27, 2005 leaving only one heir, the
Plaintiff, Deartis Preston.  Prior to Decedent’s death, she established certain
accounts on which her sister, [Scherry], and her brother, [Michael], were
signatories or had access.  Two of these bank accounts were held at First Bank,
initially bearing Account Numbers xxxxxxxx0612 (the “0612 Account”) and
xxxxxxxx0433 (the “0433 Account”) (collectively the “Accounts”), and were
certificates of deposit which were opened April 27, 2004 and October 8, 2003,
respectively.  There were signature cards executed on the Accounts, which
checked boxes titled “Joint – With Survivorship,” which Plaintiff contends are
not sufficient to establish the Accounts as valid survivorship accounts. 
Moreover, the 0612 Account had a six month maturity, and matured on October 27,
2004.  The 0433 Account had a three month maturity, and matured on January 8,
2004.  No new signature cards were executed when new certificates of deposit
were opened, either upon the maturity of the Accounts, or any downstream
maturity of different accounts (the “New COD Accounts”).  Plaintiff alleges
that the funds in the Accounts and/or New COD Accounts constitute his sole and
separate property . . . .

Dubner
alleged the following against Scherry and Michael:

No multiple-party
account will be effective against an estate of a deceased party to transfer to
a survivor sums needed to pay debts, taxes, and expenses of administration if
other assets of the estate are insufficient.  In this case, the expenses of
administration outweigh the assets of the estate.  Both [Scherry] and [Michael]
have claimed the funds held by First Bank in accounts *****0612 and ******0433
are survivorship accounts.  If these accounts are survivorship accounts, then
the funds needed to pay administration expenses, taxes, and debts belong to the
Estate of [Doris].

 

          The
trial court concluded that “[t]he facts pleaded in [Deartis’s] Third Amended Original
Petition in Cause No. PR-2005-00802-01 are established by the default liability
judgment granted by order of this Court dated March 4, 2008.”[29]
 The trial court also concluded that “[t]he facts pleaded in Dubner’s Petition
are established by the default liability judgment granted in the 3-4-08 Order.”
 Accordingly, in light of the default judgment, Scherry and Michael were deemed
to have admitted all of Deartis’s and Dubner’s factual allegations, except
damages, establishing their default judgment liability, and they may not complain
of those admissions now.  See Holt Atherton, 835 S.W.2d at 83; Morgan,
675 S.W.2d at 731.  We overrule the seventh and eighth issues in cause
02-09-00095-CV and the sixth and seventh issues in cause 02-09-00233-CV.[30]

V.  Sailfish House

          A.      Fourth
Issue—Cause 02-09-00095-CV

          In
the fourth issue in cause 02-09-00095-CV, Scherry and Michael challenge the
portion of the amended final default judgment that “divest[s] [Scherry] of
title [to the Sailfish house] through finding a constructive trust on the
property.”  They argue that “[t]he constructive trust imposed on the ‘Sailfish’
property was a remedy not available to the Probate Court.”

          A
constructive trust is a relationship with respect to property, subjecting the
person by whom the title to the property is held to an equitable duty to convey
it to another on the ground that his acquisition or retention of the property
is wrongful and that he would be unjustly enriched if he were permitted to
retain the property.  Talley v. Howsley, 142 Tex. 81, 86, 176 S.W.2d
158, 160 (Tex. 1943).  Thus, a constructive trust is a device equity uses to
remedy a wrong.  Lesikar v. Rappeport, 33 S.W.3d 282, 303 (Tex.
App.—Texarkana 2000, pets. denied); see Meadows v. Bierschwale, 516
S.W.2d 125, 131 (Tex. 1974).  A constructive trust may be imposed when one
acquires legal title to property in violation of a fiduciary relationship.  Lesikar,
33 S.W.3d at 303.  While the form of a constructive trust is practically
without limit, its existence depends upon the circumstances.  Troxel v.
Bishop, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.).  Because
imposition of a constructive trust constitutes an equitable remedy, we review
the trial court’s decision to impose a constructive trust under an abuse of discretion
standard.  Baker Botts, L.L.P. v. Cailloux, 224 S.W.3d 723, 736 (Tex.
App.—San Antonio 2007, pet. denied).

          Deartis
alleged that Scherry and Michael breached fiduciary duties that they owed to
him by using funds from the disputed First Bank accounts—funds that Deartis averred
belonged to him—to purchase the Sailfish house.  See Punts v. Wilson,
137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.) (stating that the
relationship between an executor and the estate’s beneficiaries is one that
gives rise to a fiduciary duty as a matter of law).  When one’s funds or other
assets are used by a fiduciary to acquire property for himself, the aggrieved
party may seek the property itself or its value.  Lesikar, 33 S.W.3d at 304. 
In this case, the trial court ordered a conveyance of the Sailfish house to Deartis. 
See Carr v. Weiss, 984 S.W.2d 753, 756 (Tex. App.—Amarillo 1999,
pet denied) (affirming judgment in which trial court imposed constructive trust
upon property and ordered conveyance of that property).  To the extent that
Scherry and Michael challenge the award by attempting to raise a fact issue that
money from the disputed First Bank accounts was not used to purchase the
Sailfish house, we have already explained that when the trial court granted a default
judgment in favor of Deartis, all allegations of fact set forth in Deartis’s
petition were deemed admitted, and neither Scherry nor Michael may challenge
those admissions now.  See Holt Atherton, 835 S.W.2d at 83.  We
overrule the fourth issue in cause 02-09-00095-CV.

          B.      Third
Issue—Cause 02-09-00095-CV

          In
the third issue in cause 02-09-00095-CV, Scherry argues that the trial court
erred by ordering her to make payments on the Sailfish house after imposing a
constructive trust.  The only part of the amended final default judgment that
appears to order Scherry to continue making payments on the Sailfish house is the
permanent injunction, which enjoins Scherry and all others from undertaking any
actions that would “endanger” the Sailfish house in any way, including the “failure
to make payments on the promissory note secured by the Sailfish [h]ouse and
lot.”  Scherry had no interest in the Sailfish house after the trial court
ordered a conveyance of her interest to Deartis.  Aside from characterizing payments
as support, an obligation to make installment payments on a home mortgage is
not enforceable by contempt because it constitutes imprisonment for debt.  Whitt
v. Whitt, 684 S.W.2d 731, 734–35 (Tex. App.—Houston [14th Dist.] 1984, no
writ); see Ex parte Duncan, 462 S.W.2d 336, 338 (Tex. Civ. App.—Houston
[1st Dist.] 1970, no writ).  A trial court has no ability to enforce a void
judgment, which is entirely null within itself.  Easterline v. Bean, 121
Tex. 327, 334, 49 S.W.2d 427, 429 (Tex. 1932).  We sustain Scherry’s and
Michael’s third issue in cause 02-09-00095-CV to the extent that they complain
about the part of the permanent injunction ordering Scherry to continue making
payments on the Sailfish house.

VI. 
Equitable Lien

          In
the third issue in cause 02-09-00233-CV, Scherry and Michael challenge the
portion of the final judgment that establishes an equitable lien on the
Sailfish house in the amount of $25,070.34 and in favor of Doris’s estate to
secure payment for funds from the 0612 account that were used for the purchase
of the Sailfish house.  Scherry and Michael contend that this part of the
judgment is void because “the Court previously divested [Scherry] of any
interest in the Sailfish house in the companion case.”  They set forth no
further argument and no citations to any relevant authorities to support this
single sentence contention.  The argument is inadequately briefed and,
therefore, waived.  See Tex. R. App. P. 38.1(i); Fredonia State
Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994) (discussing
“long standing rule” that issue may be waived due to inadequate briefing).  We
overrule the third issue in cause 02-09-00233-CV.

VII. 
Attorneys’ Fees as Damages

          In
the fourth issue in cause 02-09-00233-CV, Scherry and Michael challenge the awards
to Doris’s estate of (1) $29,125.45 “for attorney’s fees and expenses of
[Dubner] that would not have otherwise been incurred except for the actions
and/or inactions of” Scherry; (2) $53,186.62 “for fees and expenses
incurred by [Miller] that would not have otherwise been incurred except for the
actions and/or inactions of” Scherry; and (3) $174,067.00 “for fees and
expenses incurred by [Benolken] that would not have otherwise been incurred
except for the actions and/or inactions of” Scherry.  In the fifth issue in
cause 02-09-00095-CV, Scherry and Michael challenge the award to Deartis of
“actual damages” in the amount $127,000.  Scherry and Michael do not challenge
the award of attorneys’ fees to Benolken, Miller, and Dubner pursuant to the
order approving the account for final settlement.

          The
trial court awarded these damages based on attorneys’ fees incurred as a result
of Scherry’s and Michael’s misconduct.[31]  See Oscar M.
Telfair, III, P.C. v. Bridges, 161 S.W.3d 167, 170 (Tex. App.—Eastland
2005, no pet.) (recognizing recovery of attorneys’ fees based upon equitable
grounds when claimant was required to prosecute or defend litigation involving
third party as consequence of wrongful act of defendant).  The First Court of
Appeals recently addressed this exception to the general rule for the recovery
of attorneys’ fees, reasoning as follows:

          [Appellee]
acknowledges that the general rule in Texas is that “attorney’s fees may not be
recovered from an opposing party unless such recovery is provided for by
statute or by contract between the parties.”  However, in Turner, the
supreme court recognized, without adopting, an exception to the general rule
provided for in the Restatement of the Law:  Torts, Vol. 4 § 914.  The
exception provides that “where a plaintiff has been involved in litigation with
a third party as a result of the tortious act of another, the plaintiff may
recover in a separate suit for his reasonable and necessary expenses of the
prior litigation.”  Certain prerequisites must, however, be met.  These
include:  (1) the plaintiff must have incurred attorney’s fees in the
prosecution or defense of a prior action, and (2) the litigation must have
involved a third party and must not have been brought against the defendant in
the same action in which the fees are sought.

 

          Subsequent
to Turner, this Court and other Texas courts of appeals have held that
“equitable principles may allow the recovery of attorney’s fees and other
litigation expenses ‘where a party was required to prosecute or defend the
previous suit as a consequence of the “wrongful act” of the defendant.’”

 

Brown
& Brown of Tex., Inc. v. Omni Metals, Inc.,
317 S.W.3d 361, 399–400 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)
(citations omitted); see also G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply
Co., 177 S.W.3d 537, 546–47 (Tex. App.—Dallas 2005, no pet.).

          Although
we are not directed to any case in which this court has recognized this
exception, the exception is nonetheless inapplicable regarding cause 02-09-00233-CV
because the fees were not incurred in a prior litigation involving a third
party; the fees were incurred in the same action for which they were awarded and
for conduct caused by the same defendant.  See Brown & Brown, 317
S.W.3d at 400; see also MRO Sw., Inc. v. Target Corp., No.
04-07-00078-CV, 2007 WL 4403912, at *2 (Tex. App.—San Antonio Dec. 19, 2007,
pet. denied) (mem. op.).  Accordingly, we hold that the trial court erred by
awarding Doris’s estate attorneys’ fees as damages.  We sustain Scherry’s and
Michael’s fourth issue in cause 02-09-00233-CV.

          Similarly,
in cause 02-09-00095-CV, the award of “actual damages” was based on attorneys’
fees incurred by Benolken and Miller in the same case and involving the same
defendants.  We therefore hold that the trial court erred by awarding Deartis
attorney’s fees as actual damages, and we sustain Scherry’s and Michael’s fifth
issue in cause 02-09-00095-CV.  See Brown & Brown, 317 S.W.3d at 400;
MRO Sw., 2007 WL 4403912, at *2.

VIII.  Severing of Causes

          In
the sixth issue in cause 02-09-00095-CV and the fifth issue in cause
02-09-00233-CV, Scherry and Michael argue that the trial court committed
reversible error by severing Deartis’s suit against them from Dubner’s action
on behalf of Doris’s estate.

          The
trial court has broad discretion to sever causes.  Guar. Fed. Savs. Bank v.
Horseshoe Operating Co., 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh’g).  A
claim is severable if (1) the controversy involves more than one cause of
action, (2) the severed claim is one that would be the proper subject of a
lawsuit if independently asserted, and (3) the severed claim is not so
interwoven with the remaining action that they involve the same facts and
issues.  Id.; see State Dep’t of Highways & Pub. Transp. v.
Cotner, 845 S.W.2d 818, 819 (Tex. 1993).  The controlling reasons for a
severance are to do justice, avoid prejudice, and further convenience.  Horseshoe,
793 S.W.2d at 658.

          We
have reviewed the entire record, and we hold that the trial court acted within
its broad discretion by severing Deartis’s suit from Dubner’s suit on behalf of
Doris’s estate.  See id.  Further, Scherry and Michael have demonstrated
no harm, considering that the trial court did not enter conflicting judgments in
regard to the disputed First Bank accounts.  Accordingly, we overrule Scherry’s
and Michael’s sixth issue in cause 02-09-00095-CV and fifth issue in cause
02-09-00233-CV.

IX.  Exemplary Damages

          In
the eighth issue in cause 02-09-00233-CV and the ninth issue in cause
02-09-00095-CV, Scherry and Michael challenge the awards of exemplary damages.  We
construe their arguments as challenges to the legal sufficiency of the evidence
to support the awards.

          Unliquidated
damages include exemplary damages; therefore, evidence must be presented of
exemplary damages to sustain an award thereof in a default judgment.  Herbert
v. Greater Gulf Coast Enters., Inc., 915 S.W.2d 866, 872 (Tex. App.—Houston
[1st Dist.] 1995, no writ).  Exemplary damages may be awarded only if the
claimant proves by clear and convincing evidence that the harm with respect to
which it seeks recovery of exemplary damages results from fraud, malice, or
gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West
Supp. 2010).  If the claimant relies on a statute establishing a cause of
action and authorizing exemplary damages in specified circumstances or in
conjunction with a specified culpable mental state, exemplary damages may be
awarded only if the claimant proves by clear and convincing evidence that the
damages resulted from the specified circumstances or culpable mental state.  Id.
§ 41.003(c).  Clear and convincing evidence is that measure or degree of
proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.  Id.
§ 41.001(2) (West 2008); Tex. Fam. Code Ann. § 101.007 (West 2008); State
v. K.E.W., 315 S.W.3d 16, 20 (Tex. 2010); Transp. Ins. Co. v. Moriel,
879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the
preponderance standard of civil proceedings and the reasonable doubt standard
of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  While the
proof must be of a heavier weight than merely the greater weight of the
credible evidence, there is no requirement that the evidence be unequivocal or
undisputed.  Addington, 588 S.W.2d at 570.

          When
a specific attack is made upon the legal or factual sufficiency of the evidence
to support the trial court’s determination of damages in a default judgment,
the appellant is entitled to a review of the evidence produced.  Dawson v.
Briggs, 107 S.W.3d 739, 748 (Tex. App.—Fort Worth 2003, no pet.).  In
evaluating the evidence for legal sufficiency, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that its finding was true.  K.E.W., 315 S.W.3d at 20;
Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 248 (Tex.
2008).  We review all the evidence in the light most favorable to the finding. 
Hogue, 271 S.W.3d at 248.  We resolve any disputed facts in favor
of the finding if a reasonable factfinder could have done so.  K.E.W.,
315 S.W.3d at 20; Hogue, 271 S.W.3d at 248.  We disregard evidence
contrary to the finding unless a reasonable factfinder could not.  K.E.W.,
315 S.W.3d at 20; Hogue, 271 S.W.3d at 248.  That is, we consider
undisputed evidence even if it is contrary to the finding.  Hogue, 271
S.W.3d at 248; City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex.
2005).  Evidence that merely exceeds a scintilla is not legally sufficient.  K.E.W.,
315 S.W.2d at 20.  If we determine that no reasonable factfinder could form a
firm belief or conviction that its finding was true, then we must conclude that
the evidence is legally insufficient.  Diamond Shamrock Ref. Co. v. Hall,
168 S.W.3d 164, 170 (Tex. 2005); Sw. Bell Tel. Co. v. Garza, 164
S.W.3d 607, 627 (Tex. 2004).  Generally, if we determine that evidence is
legally insufficient, we must then reverse and render judgment.  In re
J.F.C., 96 S.W.3d 256, 266 (Tex. 2002); see Tex. R. App. P. 43.3;
Garza, 164 S.W.3d at 626 & n.58.

          A.      Ninth
Issue—Cause 02-09-00095-CV

          The
trial court awarded Deartis exemplary damages in the amount of $414,000.  The
trial court made the following findings of fact, among others:

7.       By her
breach of fiduciary duty, [Scherry] intended to gain an additional unwarranted
benefit and engaged in self dealing.

 

8.       By his
breach of fiduciary duty, [Michael] intended to gain an additional unwarranted
benefit and engaged in self dealing.

 

          We
have already held above that the trial court erred by awarding Deartis “actual
damages” in the amount of $127,000 based on attorneys’ fees.  Notwithstanding
interest, the only other relief that the trial court awarded Deartis—upon his
claims for breach of fiduciary duty or conspiracy to breach fiduciary duties—related
to the Sailfish house, including (1) title to the Sailfish house, (2) an
injunction enjoining “any actions which would endanger the Sailfish [h]ouse in
any way,” and (3) a declaration that the Sailfish house was Deartis’s sole
and separate property.  Exemplary damages are not available unless a plaintiff
establishes that it sustained actual loss or injury as the result of an
underlying tort.  See Tex. Civ. Prac. & Rem. Code Ann. § 41.004(a)
(West 2008); Fed. Express Corp. v. Dutschmann, 846 S.W.2d 282, 284 (Tex.
1993).  While the mere grant of injunctive relief will not support an award of
punitive damages, the supreme court has recognized a “recovery of property”
exception to the rule requiring the recovery of actual damages, noting that
“where equity requires the return of property, this ‘recovery of the
consideration paid as a result of fraud constitutes actual damages and will
serve as a basis for the recovery of exemplary damages.’”  Nabours v.
Longview Sav. & Loan Ass’n, 700 S.W.2d 901, 904–05 (Tex. 1985)
(reasoning that its holding that the mere grant of injunctive relief will not
support an award of punitive damages “should not be confused with an absolute
refusal to allow punitive damages in a case where equitable relief is had”); Lesikar,
33 S.W.3d at 310.  Deartis’s award of complete title to the Sailfish house is an
award that appears to fit within the requirement that he recover actual damages
to sustain an award of exemplary damages.

          The
trial court found that “[t]here is factually sufficient evidence to justify the
exemplary damages award for breach of fiduciary duty . . . .”  A
defendant’s intentional breach of fiduciary duty is a tort for which a
plaintiff may recover exemplary damages.  Lesikar, 33 S.W.3d at 311. 
The court in Lesikar stated,

While
it is a general rule that Texas courts allow the recovery of punitive damages
where the defendant, in committing a tort, acted willfully, maliciously, or
fraudulently, where punitive damages are awarded for breach of fiduciary duty
the actual motives of the defendant and whether the defendant acted with malice
are immaterial.  But something more than a simple breach is required for the
recovery of punitive damages; the acts constituting the breach must have been
fraudulent, or at least intentional.  An intentional breach may be
found where the fiduciary intends to gain an additional benefit for himself. 
[T]he Supreme Court [has] suggested that willful and fraudulent acts are
presumed when the fiduciary . . . gains an additional benefit for
himself as a result of his breach.

 

Id.  (emphasis
added) (citations omitted).  We therefore examine the sufficiency of the
evidence to support the award of exemplary damages for Scherry’s or Michael’s
breach of fiduciary duty in regard to the Sailfish house.

          At
the prove-up hearing on Deartis’s damages, Miller testified that Scherry paid
$24,520.38 towards the closing on the Sailfish house and that those funds came
from a check that Michael had drawn on one of the disputed First Bank
accounts.  Miller stated that Scherry did not contribute any of her own money
towards the purchase of the Sailfish house; that Scherry placed both her name
and Deartis’s name on the title to the Sailfish house; that such action
constituted a breach of both Scherry’s and Michael’s fiduciary duties to
Deartis; and that Scherry “obtain[ed] a benefit” by having her name on the
title to the Sailfish house.  Miller did not explain or elaborate in any way on
her testimony that Scherry “obtain[ed] a benefit.”  Although Scherry may have
intended to have her name on the title and, according to Miller, “obtained a
benefit” by doing so, there is no evidence that Scherry or Michael breached a
fiduciary duty to Deartis by putting Scherry’s name on the title with the
intent to gain some additional benefit, nor do the surrounding
circumstances or circumstantial evidence support that inference.[32] 
In other words, there is no evidence that Scherry or Michael breached any
fiduciary duty to Deartis for the purpose of obtaining a benefit for
themselves.  Even if Miller’s testimony amounted to more than a scintilla of
evidence of that fact and did more than raise a mere surmise and suspicion of
that fact, her testimony, without more, was not capable of producing a firm
belief or conviction that Scherry or Michael breached a fiduciary duty with the
intent to gain some benefit therefrom.  To the extent that the trial court awarded
exemplary damages based on some other theory, there is no evidence that any
harm resulted from fraud, malice, or gross negligence.  See Tex. Civ.
Prac. & Rem. Code Ann. § 41.003(a).  We hold that the evidence is
legally insufficient to support the award of exemplary damages, and we sustain
Scherry’s and Michael’s ninth issue in cause 02-09-00095-CV.

          B.      Eighth
Issue—Cause 02-09-00233-CV

          The
trial court awarded Doris’s estate exemplary damages in the amount of
$180,716.94.  The trial court adopted the following findings regarding
exemplary damages:

31.     The clear and
convincing evidence reflects that the conduct of [Scherry] and [Michael] has
been outrageous and that both [Scherry] and [Michael] have at all times
exhibited a flagrant disregard of the orders of this Court.

 

32.     [Michael] at
all times was fully aware that [Scherry] was acting in contravention of her
fiduciary duties as administratrix of the Estate and conspired with [Scherry]
in connection with such breach.

 

33.     Based on the
conduct of [Michael] and [Scherry], it would be appropriate to award the Estate
judgment . . . for exemplary damages in the amount of $180,716.94.

          At
the prove-up hearing on the damages to Doris’s estate, Dubner testified in the
narrative, “I’m asking the Court to give -- award exemplary damages, based
on clear and convincing evidence, of two times the amount of actual damages,
not including attorney’s fees, strictly on the damages themselves for the funds
. . . .”  On cross-examination, Dubner agreed that Scherry’s conduct
during the case was “egregious,” and he testified that Scherry and Michael had
“obfuscated the legal process” and that “this case is the type of case that
does warrant exemplary damages, based on [Scherry’s] behavior and the fact that
she failed continuously, time after time, to follow court orders, to do things
that she was asked to do, and basically thumbed her nose at the entire
process.”

          To
the extent that the trial court awarded exemplary damages based on Dubner’s
breach of fiduciary duty claims, there is no evidence that Scherry or Michael
breached a fiduciary duty to Doris’s estate with the intent to gain some
additional benefit.  See Lesikar, 33 S.W.3d at 311.  To the
extent the trial court awarded exemplary damages based on some other theory,
there is no evidence that any harm resulted from fraud, malice, or gross
negligence.  See Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). 
We hold that the evidence is legally insufficient to support the award of
exemplary damages, and we sustain Scherry’s and Michael’s eighth issue in cause
02-09-00233-CV.

X.  Conclusion

          Having
sustained Scherry’s and Michael’s third, fifth, and ninth issues in cause
02-09-00095-CV, we modify the amended final default judgment in that cause to
delete (1) the award of actual damages in the amount $127,000.00, (2) the
award of exemplary damages in the amount of $414,000.00, and (3) the
portion of the permanent injunction requiring Scherry to continue making
payments on the Sailfish house.  Having sustained Scherry’s and Michael’s
fourth and eighth issues in cause 02-09-00233-CV, we modify the final judgment
in that cause to delete (1) the awards for fees and expenses in the
amounts of $29,125.45, $53,186.62, and $174,067.00 and (2) the award of
exemplary damages in the amount of $180,716.94.  Having overruled the remainder
of their issues in both causes, we affirm the judgments in cause 02-09-00095-CV
and cause 02-09-00233-CV as modified.

 

 

BILL MEIER
JUSTICE

 

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

 

LIVINGSTON, C.J. filed a concurring and
dissenting opinion.

 

DELIVERED:  July 14, 2011


 
 
 
 
 
 
 
 


 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
 
 


 

NO. 02-09-00095-CV

NO. 02-09-00233-CV

 

 


 
 
 IN
 THE ESTATE OF DORIS
 ROSE
 PRESTON, DECEASED
 
 


 

 

------------

 

FROM THE Probate
Court OF Denton COUNTY

------------

CONCURRING
AND DISSENTING OPINION

------------

          I
join the majority opinion and judgments in all respects except for the failure
to affirm the award of exemplary damages.

          The
trial court’s amended final default judgment awarded Deartis Preston $414,000 and
the final judgment awarded Doris’s estate $180,716.94 in exemplary damages
based on its finding of sufficient clear and convincing evidence.  In the trial
court’s findings of fact and conclusions of law, it found that appellants had
breached their fiduciary duties to appellees; that such breaches were committed
with an intent to gain benefits and consisted of self-dealing; that appellants
conspired with each other in these breaches; that the torts of civil conspiracy
and breach of fiduciary duty supported the awards; and that the awards were
justified.  Furthermore, the trial court found that there was sufficient
evidence under the Kraus factors to support the awards by looking to the
nature of the wrongful character of the conduct involved, the degree of
culpability of the wrongdoers, the situation and sensibilities of the parties
concerned, and the extent to which such conduct offends the public’s sense of
justice and propriety.  See Alamo Nat’l Bank v. Kraus, 616 S.W.2d 908, 910
(Tex. 1981).  Additionally, the trial court found such awards were not
unconstitutionally excessive and comported with the Texas Civil Practice &
Remedies Code.  See id.; Tex. Civ. Prac. & Rem. Code Ann.
§ 41.008 (West Supp. 2010); Kraus, 616 S.W.2d at 910.  And in its
conclusions of law, the trial court concluded that it, as the factfinder, could
reasonably form a firm belief or conviction that its findings were true.

          Furthermore,
because the trial court specifically found that both appellants not only
committed a breach of their fiduciary duties but also were in a conspiracy to
commit these breaches, I believe there is sufficient evidence of their intent
to gain unwarranted benefits and engage in self-dealing.  See, e.g.,
Paradigm Oil, Inc. v. Retamco Operating, Inc., 330 S.W.3d 342, 358 (Tex.
App.—San Antonio 2010, pet. filed).

          For
all of these reasons, I would affirm the part of the trial court’s judgments
awarding exemplary damages.

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

DELIVERED: 
July 14, 2011









[1]The portion of the final
judgment in cause 02-09-00233-CV in favor of Doris’s estate was assigned to
Deartis.  Deartis did not file a brief in either cause.





[2]Gwendolyn was “born
retarded,” and Deartis has a “retardation.”





[3]According to Michael,
Doris “took care of” Deartis, Gwendolyn, and Eva.





[4]Scherry testified that she
obtained the power of attorney so that she could receive funds from Doris’s
teacher retirement account.





[5]Benolken identified the
accounts as ending in 0612 and 0433.





[6]The requested information
included “account information from January 1, 2005 through the present . . .
regarding all checking, savings, money market, certificates of deposit,
brokerage, stocks, bond, annuity or other accounts that Deartis Preston and/or
Doris Preston has and/or had an ownership interest in and/or was a named
owner.”





[7]Deartis later filed
several amended petitions.





[8]Benolken alleged in part
that “the agreements, contracts, accounts, certificates of deposit, and
signature cards do not comply with the requirements of Tex. Prob. Code §§439
and 439A”; “that the Accounts are not accounts with a valid right of
survivorship and/or do not constitute valid payable on death accounts”; and
“that the entirety of said Accounts are assets of the Estate of Doris Rose
Preston.”





[9]Deartis, Gwendolyn, and
Eva moved into the house.





[10]Benolken also opined that
Deartis would be “on the hook under the deed of trust” if Scherry did “not
comply with the terms of the note,” which only she signed.





[11]Benolken testified in
part that Michael had charged the estate $2,000 for travel expenses without the
trial court’s approval.





[12]Benolken noted Scherry’s
(1) placing the Sailfish house in both her name and Deartis’s name, (2)
accepting money from Michael out of one of the disputed accounts, and (3)
obtaining a power of attorney from Deartis.





[13]The record shows that a
number of deposits were made into the trial court’s registry around this time.





[14]Western Surety later
settled Dubner’s claims against it for $85,000.





[15]The trial court had
granted Scherry’s application to authorize the demolition of the Austin Street
house back in July 2006, but Scherry never had the house demolished.





[16]Benolken, Miller, Dubner,
and counsel for Scherry and Michael signed the following stipulation:

[A]ll prior testimony and documentary evidence obtained
and admitted in all prior hearings in this cause (PR-2005-00802-01), in Estate
Case No. PR-2005-00802, and in Guardianship Case No. GS-2007-00162, together
with all orders entered in each of the foregoing causes, are admitted conclusively
as evidence to be considered and used for all purposes with regard to all
matters which have been noticed and/or set for hearing in this cause, whether
as a continuation of any prior hearing(s) or as an initial hearing, on October
26, 2007, and any continued or related hearing or trial thereafter.





[17]This is the judgment that
Scherry and Michael appeal from in appellate cause 02-09-00095-CV.





[18]This is the judgment that
Scherry and Michael appeal from in appellate cause 02-09-00233-CV.





[19]This figure consists of
damages in the amount of $92,213.73 less a credit of $80,383.93 plus
prejudgment interest of $848.90.





[20]This figure consists of
damages in the amount of $78,368.14 less a credit of $184.47 plus prejudgment
interest of $5,451.42.





[21]The trial court had granted
a summary judgment in favor of Western Surety on March 25, 2009, based on an
indemnity agreement executed by Scherry.





[22]The trial court made the
following finding in the March 4, 2008 consolidated order on motions to compel
and for sanctions and show cause:

45.     The Court has every
confidence in . . . counsel for [Scherry] and [Michael]
. . . .  Based on the evidence presented over the course of
these hearings, the Court believes that [counsel] made every effort to gain
[Scherry’s] and [Michael’s] compliance with this Court’s orders that were
entered in these Related Cases.





[23]The trial court even
excused Scherry’s and Michael’s failure to comply with the May 18, 2007
deadline that it had set earlier.





          [24]Nonetheless, the trial court stated
at the conclusion of the April 23, 2007 show cause hearing that it “will have under
advisement the possibility of the following sanctions:  Removal of [Scherry] as
. . . dependent administratrix . . . .”  The trial
court followed through and imposed this lesser sanction, removing Scherry as
dependent administratrix on June 14, 2007, and appointing Dubner successor
dependent administrator.  The trial court therefore tested lesser sanctions.





[25]To the extent that
Scherry and Michael raise any other arguments within their first issues that
are not addressed by our analysis, those arguments are waived as inadequately
briefed.  See Tex. R. App. P. 38.1(i).





[26]See Paradigm Oil, Inc.
v. Retamco Operating, Inc., 242 S.W.3d 67, 71–72 (Tex. App.—San Antonio
2007, pet. denied) (holding that when all allegations in petition, including
those that established standing, were deemed admitted as a result of a default
judgment, defaulting party was estopped from denying the plaintiff’s standing).





[27]Scherry and Michael argue
in the seventh issue that Deartis’s pleadings establish as a matter of law that
the disputed First Bank accounts were joint accounts with rights of
survivorship.  In the eighth issue, Scherry and Michael argue that the record
does not support Deartis’s claim that the funds in the disputed accounts did
not belong to them.





[28]Scherry and Michael argue
in the sixth issue that the disputed accounts’ signature cards and incorporated
documents created a joint tenancy with rights of survivorship.  In the seventh
issue, Scherry and Michael argue that there is no evidence in the record to
support the trial court’s judgment.





[29]We have already reasoned
above that Deartis had standing to assert claims against both Scherry and
Michael.





[30]To the extent that
Scherry and Michael raise any other arguments within these six issues that are
not addressed by our analysis, those arguments are waived as inadequately
briefed.  See Tex. R. App. P. 38.1(i).





[31]It is less clear that the
judgment in cause 02-09-00095-CV awarded damages based on attorneys’ fees
incurred, but the record supports this conclusion.





[32]At the January 19, 2007
hearing on Deartis’s motion to compel, Scherry testified that title to the
Sailfish house was partly in her name because Deartis had no credit in his
name.